## KETCHUM COAL CO. v. PLEASANT VALLEY COAL CO. et al.

N. 3072. Decided September 26, 1917. (168 Pac. 86.)

1. EMINENT DOMAIN—DECISIONS REVIEWABLE—"FINAL JUDGMENT." In a proceeding to condemn land, where judgment denies condemnation of a substantial part of the land desired, plaintiff may appeal therefrom without waiting until damages are assessed. (Page 399.)

2. PUBLIC LANDS—DECISIONS OF LAND OFFICE—COLLATERAL ATTACK. In absence of fraud, the findings and decisions of the officers of the land office in a land contest cannot be collaterally attacked by one claiming through the predominating party in such contest. (Page 407.)

3. MINES AND MINERALS—ACQUISITION AND TRANSFER BY ONE DISQUALIFIED FROM HOLDING TITLE. One disqualified from holding title to coal lands could receive a title from a person having it, and transfer it to another who can lawfully take it. (Page 409.)

4. ESTOPPEL.—AFTER-ACQUIRED TITLE—CONVEYANCES BEFORE PATENT. One who conveys coal lands, before he has applied to the government to purchase the same, conveys a good title thereto, if he subsequently acquires the land, under Comp. Laws 1907, section 1979, relating to after-acquired titles. (Page 410.)

5. ESTOPPEL—SALES OF LAND—PERSON CLAIMING UNDER VENDOR. One who is claiming with full knowledge of the facts under a person who

has sold land and abided by the sale for twenty-five years, and the land has been improved, is estopped to deny that the transfer was valid. (Page 411.)

6. PUBLIC LANDS—CONVEYANCE TO DISQUALIFIED PERSONS—STATUTES. U. S. Comp. St. 1916, section 5025, making void land entered by one for another, has no bearing, where the patent was lawfully acquired, but was conveyed to one disqualified from holding title. (Page 411.)

7. EMINENT DOMAIN—COAL COMPANIES—TIPPLE SITES. Coal companies, under the statute, have the right to condemn ground for a tipple site, for screening, grading, handling, and loading coal on cars. (Page 414.)

8. EMINENT DOMAIN—PROPERTY SUBJECT—RAILROAD RIGHTS OF WAY. A coal company cannot condemn any portion of a right of way used for railroad purposes for a tipple site, either under the law generally, or under Comp. Laws 1907, section 3590, subsec. 5, relating to crossings, intersections, and connections. (Page 414.)

9. PUBLIC LANDS—RIGHTS OF WAY—PURPOSES AND USES. A right of way granted by Congress and devoted to transportation by a common carrier cannot, either with or without the consent of the carrier, be devoted to permanent structures such as tipples for a coal company.[1] (Page 417.)

10. EMINENT DOMAIN—COAL COMPANIES—DEDICATED RIGHT OF WAY. Although a track departs from a right of way, it cannot be approached, by a coal company condemning land for a tipple site, so close as to interfere with traffic, and five feet is not an unreasonable minimum distance. (Page 418.)

Appeal from District Court, Seventh District; *Hon. A. H. Christensen*, Judge.

Condemnation proceedings by the Ketcham Coal Company against the Pleasant Valley Coal Company, the Denver & Rio Grande Railroad Company and the Guaranty Trust Company.

Judgment allowing partial condemnation only. Plaintiff appeals.

AFFIRMED.

*Boyd, Devine & Eccles* and *Walton & Walton* for appellant.

*Van Cott, Allison & Riter* and *Ellis, Schulder & Lucas* for respondents.

---

[1]*Postal Tel. & Cable Co.* v. *O. S. L. R.*, 23 Utah, 474, 65 Pac. 735, 90 Am. St. Rep. 705.

FRICK, C. J.

Proceedings arising out of different phases of this case have been considered by us twice before. *Ketchum Coal Co.* v. *Christensen,* 48 Utah, 214, 159 Pac. 541; *Ketchum Coal Co.* v. *District Court,* 48 Utah, 342, 159 Pac. 737. In both of those proceedings merely preliminary questions were involved. After the preliminary questions had been settled by this court, the case was finally heard upon the merits by the district court of Carbon County, which granted the claims of the plaintiff as against the defendant Pleasant Valley Coal Company in part and as against said company denied them in part; and as against the Denver & Rio Grande Railroad Company plaintiff was denied all relief. The principal defendants in this action are the Pleasant Valley Coal Company, hereinafter called P. V. C. Co., and the Denver & Rio Grande Railroad Company, hereinafter designated Railroad Co. The other defendants are merely mortgagees and need not be further mentioned. The action was commenced by the plaintiff to condemn a certain strip of ground over certain lands belonging to the P. V. C. Co., and also to condemn a portion of the right of way of the Railroad Co. We here insert a rough sketch which illustrates just what the plaintiff seeks to obtain in this action:

The sketch is supposed to cover precisely forty acres of land. North of and adjoining the forty acres shown on the plat the

P. V. C. Co. owns another forty acres, and another forty acres west of and adjoining the last-named forty acres. It also owns another forty acres immediately south of and adjoining the forty acres shown on the plat. The P. V. C. Co. thus claims to own four forties lying in the shape of an L, the long stem of which extends north and south. The Railroad Co. owns a right of way 200 feet in width over the forty acres shown on the plat, the boundaries of which are indicated by the lines marked "R. W." The Railroad Co. owns and operates a number of tracks on its right of way, three of which are shown on the plat. The most northerly one is marked "T. 4," the next one to the south is marked "T. 3," and the one still farther south is marked "M. L." which is the main line. The plaintiff owns eighty acres of coal land on which it operates a coal mine which adjoins the P. V. C. Co.'s land on the east, and the northeast corner of the forty acres shown on the plat connects with the southwest corner of plaintiff's eighty acres. The plaintiff desires to condemn a strip of ground sixty feet in width and between 1,300 and 1,400 feet in length over the P. V. C. Co.'s land shown on the plat. The strip sought to be condemned is marked "A" on the plat, and it is desired to be used for tramways, tunnels, etc., for the purpose of transporting coal which the plantiff mines from its coal mine on the ground lying to the north and east of the P. V. C. Co.'s land as aforesaid. The plaintiff, in connection with said strip "A," also seeks to condemn a strip of ground containing 1.42 acres, a large part of which is on the Railroad Co.'s right of way, for a tipple site. The strip sought to be condemned for that purpose lies between track No. 3 and Track No. 4, and is marked "T. S.—T. S." on the plat. The plaintiff also sought to extend the sixty-foot strip southward on the railroad right of way, as indicated by the broken lines on the plat. Both the plaintiff and the P. V. C. Co., however, concede the Railroad Co.'s title for railroad purposes to the right of way as indicated by the line "R. W." The objects indicated on the plat are all greatly enlarged so as to be more readily understood.

On the hearing, the district court found the title to the whole 160 acres, not included within the Railroad Co.'s right

of way, to be in the P. V. C. Co.; found that the Railroad Co. had title from the United States government to the right of way; and found that the plaintiff did not have title to any of the 160 acres. We shall refer to the question of title again later in this opinion. The district court limited plaintiff's right to condemn as follows: The court denied plaintiff's claim to condemn any part of the Railroad Co.'s right of way for a tipple site and refused to extend the sixty-foot strip on to the right of way, but allowed the plaintiff the right to condemn said strip only to within five feet of the outer rail of track No. 4 indicated on the plat. It will be observed that track No. 4 departs from the right of way at the point where the sixty-foot strip connects with said track. The district court, however, limited plaintiff's right to condemn to a point approximately five feet north from the northerly rail of track No. 4, as indicated by the double line on the plat. The district court entered judgment condemning the sixty-foot strip over the P. V. C. Co.'s land to the point aforesaid, and also entered judgment denying plaintiff all other right to condemn, and dismissed the action as against the Railroad Co. The plaintiff appeals from the judgment.

Counsel for the defendants have filed a separate motion on behalf of each defendant, to dismiss the appeal, upon the ground that the judgment appealed from is not a final judgment and hence is not appealable. It is argued with much force by counsel for the defendants that the judgment appealed from does not finally determine and dispose of all the questions involved, for the reason that the question of damages to which the P. V. C. Co. may be entitled for the value of the strip which the court condemned, and for incidental damages, is left undetermined. It is quite true that the plaintiff appealed before proceeding to assess the damages to which the P. V. C. Co. may be entitled in case plaintiff continues in possession and use of the strip condemned by the court. It should, however, be kept in mind that the plaintiff was given the right to condemn only a portion of the land it sought to condemn, and was denied the right to condemn any land for a tipple site as against the Railroad Co.

If the court had denied the plaintiff's right to condemn anything, the question regarding the right of appeal would be entirely free from doubt and difficult. Inasmuch as the court has granted plaintiff's claim in part, however, it is contended by the defendants that the judgment is not final until the damages have been assessed for the land ordered condemned. Now, it may well be that the plaintiff does not desire the strip ordered condemned unless it can likewise obtain the proposed tipple site in connection therewith. Suppose condemnation proceedings were instituted by a railroad company for a right of way, including ground for side tracks and station grounds, and the trial court limited its right to condemn to a strip twenty-five feet in width, an amount wholly insufficient for the needs of the company for the purposes aforesaid. Would the company be required to assess damages for a strip of ground it did not want, and which was wholly inadequate for its needs, before appealing to this court? Would not the trial court's action in such case be equivalent to denying the company the right to condemn? True, the case at bar is not precisely parallel to the supposed case, but the difference is one of degree and not of principle. Here, as in the supposed case, the plaintiff may not desire the sixty-foot strip at all, unless it can obtain the ground it sought for a tipple site in connection therewith. But if it be assumed that it would, nevertheless, take what it could get, yet, under the facts and circumstances, it should not be required to assess damages until it has been finally determined by the appellate court just what, under the law, it may condemn. In the case of *Ketchum Coal Co.* v. *District Court, supra,* we, in effect, held that the question of ownership of the ground sought to be condemned and affected by the condemnation proceedings must be determined before the damages could properly be assessed. It is just as essential that the right to condemn, and the extent that the right may be exercised, be determined before proceeding to assess the damages. If that be not done, then, as pointed out in the case last referred to, this case must be determined by piecemeal. True, we said in the former case that to constitute a final judgment the case must be determined as to all parties.

That language is, however, used and must be considered in the light of the issues there presented and in connection with all that was said. We also there said that cases cannot be split up and considered piecemeal. Now, if the contention of the defendants shall prevail in this case, and the plaintiff should finally succeed in its contention by having this court modify the judgment of the district court by condemning the ground claimed by plaintiff for a tipple site, then the damages would have to be assessed twice, once for the strip ordered condemned by the trial court and once for the additional strip ordered condemned by this court for a tipple site, a part of which is owned by the Railroad Co. and another part by the P. V. C. Co. This would compel the plaintiff to try the case by piecemeal, which we held in the proceeding last referred to should not be done.

Counsel for the defendants, however, cite a large number of cases in which they contend it has been held that the judgment in the case at bar is not a final and hence not an appealable judgment. Among other cases, they cite and rely on the following: *Burlington & C. R. Co.* v. *Colo. E. R. Co.,* 45 Colo. 222, 100 Pac. 607, 16 Ann. Cas. 1002; *Luxton* v. *North River Bridge Co.,* 147 U. S. 337, 13 Sup. Ct. 356, 37 L. Ed. 194; *Traction Co.* v. *Schenk,* 73 W. Va. 226, 80 S. E. 345; *Ludlow* v. *City of Norfolk,* 87 Va. 319, 12 S. E. 612; *Hendrick* v. *Railroad,* 98 N. C. 431, 4 S. E. 184; *Forest Cemetery Ass'n* v. *Constans,* 70 Minn. 436, 73 N. W. 153; *Duluth Tr. Ry. Co.* v. *Duluth Terml. Ry. Co.,* 81 Minn. 62, 83 N. W. 497; *Atley* v. *Commissioners,* 77 Ohio St. 285, 82 N. E. 1079; *In re Minn. & Wis. Ry Co.,* 103 Wis. 191, 78 N. W. 753; *Crompton Carpet Co.* v. *Worcester,* 119 Mass. 375; *Matter of Grab,* 157 N. Y. 69, 51 N. E. 398; *Chicago Tr. Co.* v. *Preucil,* 236 Ill. 491, 86 N. E. 117; *Tacoma* v. *Nisqually Power Co.,* 54 Wash. 292, 103 Pac. 49. We have given all of the cases referred to by counsel which directly refer to the proposition contended for by them. In not a single one of those cases is the question now under consideration passed on. The case which most nearly approaches the question is the one from Colorado, the first one cited. In that case, however, the court entered judg-

ment condemning all that the condemner asked to be condemned, and the condemnee attempted to appeal to the Supreme Court before the damages were assessed. If that were the case here, that is, if the district court had entered judgment condemning all that the plaintiff sought to condemn, or so much that it might be said that it obtained practically all it asked for, we should not hesitate to deny the defendants the right to appeal before the damages were assessed. If, in such a case, an appeal were allowed, it would result in splitting the action, in that it would authorize an appeal while the question of damages was still undetermined. To deny the appeal in this case, however, would likewise result in splitting the action, for the reason that plaintiff's right to condemn has been denied in a material part, and hence damages could only be assessed for the part condemned, and the assessment for the remaining part asked to be condemned, if allowed by this court, would have to be postponed until after this court had determined the right to condemn. The plaintiff would thus not be permitted to assess the damages at one time and by the same jury. As before stated, however, the cases cited by counsel do not sustain their contention. In *Luxton* v. *North River Bridge Co.*, supra, the United States Supreme Court held that an order appointing commissioners to assess the damages for lands sought to be condemned was not a final judgment and hence not appealable. In *Ludlow* v. *City of Norfolk,* supra, it is said:

A "judgment appointing commissioners to fix a just compensation for land proposed to be taken in condemnation proceedings is not final and appealable."

It is only necessary to say that all the other cases are precisely to the same effect. What is said by the Supreme Court of North Carolina in *Hendrick* v. *Railroad,* supra, is quite significant. In that case the court held that an order appointing commissioners to assess damages in a condemnation proceeding is not a final judgment. The court, however, said:

"The order appealed from (however) is very different from that in the similar case of *Chick* v. *The Railroad Co.* (98 N. C. 390, 4 S. E. 183), decided at the present term; in the latter the court denied the motion for an order appointing commissioners and dismissed the proceeding,

thus putting an end to the right of the plaintiff therein, and therefore an appeal lay in that case.''

In that case, therefore, the true distinction is recognized and pointed out. If the right to condemn is denied in toto, there can be no doubt respecting the condemner's right to appeal, and if it is denied in a substantial and material part, so that what is allowed is not what the condemner seeks or requires, then again there should be no doubt respecting his right of appeal. In either case what he seeks is denied him, and the denial is final and conclusive unless reversed on appeal. Moreover, in case the whole claim is denied no damages can be assessed, and in case it is only partly denied it results in splitting the case so far as assessment of damages is concerned, and, under certain circumstances, might make it quite impracticable, if not impossible, to intelligently pass upon the question of damages.

Counsel for plaintiff have, however, also cited cases in which they contend it has been held that condemnation proceedings, under certain circumstances, are divisible, and that appeals will lie before the whole case is finally determined. They cite *In re St. P. & N. W. Ry. Co.*, 34 Minn. 237, 25 N. W. 345; *State* v. *Oshkosh, etc., Ry. Co.*, 100 Wis. 538, 77 N. W. 193; *City of Bluefield* v. *Bailey*, 62 W. Va. 304, 57 S. E. 805; *Wheeling, etc., Co.* v. *Wheeling Bridge Co.*, 138 U. S. 287, 11 Sup. Ct. 301, 34 L. Ed. 967; *McLean* v. *District Court*, 24 Idaho, 441, 134 Pac. 536, Ann. Cas. 1915D, 542; *Jackson* v. *Jackson*, 175 Fed. 710, 99 C. C. A. 286; *Potter* v. *Beal*, 50 Fed. 860, 2 C. C. A. 60; 3 C. J. 356; 2 R. C. L. 42; 2 Lewis, Eminent Domain, 803. The case cited from Minnesota was expressly overruled by the Supreme Court of Minnesota in the cases referred to in defendants' citations from that state. While some of the other cases cited are more or less in point upon plaintiff's contention, yet in none of them is the precise question here involved decided. In 3 C. J. 448, it is said:

''There are many cases in which it has been held that a decree may be final in the sense that it may be appealed from although not final in the strict technical sense of the term, and in which, where the court has finally adjudicated part of the merits, the judgment, order, or decree has been held quoad hoc final and appealable.''

In 3 Words and Phrases, 2781, where numerous definitions of final judgments are given, it is said:

"An exact definition of a final decree applicable to all cases possible to arise in practice is not easily given. It is not always necessary to dispose of the entire merits of the cause and all the parties before the court as a necessity to a final decree upon certain particular conceded or established rights."

In that connection it is further said:

"The finality of a decree is not determined by the state of the suit at the time it is rendered, but upon whether it concludes a party in imposing on him a liberty or depriving him of a right."

See, also, *Tucker* v. *Yell*, 25 Ark. 420-432, where an interesting discussion respecting what constitutes a final judgment for the purposes of appeal will be found. The excerpt quoted from 3 Words and Phrases is taken from that case. See, also, *Alexander* v. *Bates*, 127 Ala. 328, 28 South. 415-419.

In *Sharon* v. *Sharon*, 67 Cal. 196, 7 Pac. 463, it is said:

"A final judgment is not necessarily the last one in an action. A judgment that is conclusive of any question in a case is final as to that question."

The foregoing principle is illustrated and applied by this court in the cases of *Bristol* v. *Brent*, 35 Utah, 213, 99 Pac. 1000, and *Parsons* v. *Parsons*, 40 Utah, 602, 122 Pac. 907. We need not pause now to show that the principle announced in those two cases is clearly applicable here.

We are aware that in *Re Kelsey*, 12 Utah, 393, 43 Pac. 106, the Utah Territorial Supreme Court refused to follow the case of *Sharon* v. *Sharon*, supra, but that in no way affects the principle contained in the excerpt quoted from the Sharon Case; nor does it in the least affect the doctrine laid down by this court in the Bristol and the Parsons Cases.

It is not necessary to pursue the authorities further. We have no desire to depart from the wholesome and salutary rule constantly adhered to by this court that appeals will be permitted only from final judgments; yet neither do we desire to lay down a rule in that respect which would result in sacrificing substance for mere shadow. This case is an illustration that circumstances and conditions may arise where both common sense and justice unite in requiring that an appeal be allowed before every question that may be involved

in a particular case is finally determined.  In the case at bar it must be apparent to all that if this appeal should be dismissed the plaintiff would be required to assess damages for property it may not desire at all if, ultimately, the questions on appeal are determined against it.  Moreover, the questions that are included in the court's judgment, so far as the right to condemn is concerned, are conclusive unless reversed.

It follows, therefore, that the motions to dismiss the appeal should be, and they are accordingly, denied.

We now proceed to a consideration of the merits, and in doing so we shall first discuss the question of title.

Both the plaintiff and the defendant P. V. C. Co. claim title to the 160 acres of coal land in question from the same source.  It is more convenient to consider the P. V. C. Co.'s title first.

The following facts are found by the court and are not disputed.  On May 14, 1888, the 160 acres in question were vacant, unoccupied coal lands of the United States, open to entry, exploration, and purchase.  On that day one Stephen R. Marks, a citizen of the United States, of lawful age, filed his coal declaratory statement as provided by the United States statute (Act Cong. March 3, 1873, c. 279, section 1, 17 Stat. 607 [U. S. Comp. St. 1916, section 4659]), and, in compliance therewith, on March 29, 1889, made application to purchase said land.  His application to purchase was protested by one Sprunt upon the ground that the application was made on behalf of the P. V. C. Co.  Upon a hearing on the protest in the United States local land office, it was found that Sprunt's protest was not well founded and therefore it was not sustained.  An appeal from the findings and decision of the local land office was taken to the United States Commissioner of the General Land Office where the decision was affirmed.  Thereafter, and pursuant to the application to purchase, Marks, on October 2, 1890, entered and paid the purchase price for said land to the United States government and received a receipt showing payment.  Thereafter, on June 5, 1891, the government duly issued a patent to Marks for said land.  Before Marks had made the application to purchase,

however, as aforesaid, and before paying for said land, he, on October 25, 1888, by deed, conveyed the same to one Williams, which deed was duly recorded in the proper office in Emery County, Utah, which county then embraced the territory in question. On October 2, 1890, the wife of Mr. Marks, by deed, duly relinquished her dower right in and to said land to said Williams, which deed was recorded in the county aforesaid on October 28, 1890. On October 26, 1888, said Williams, by deed, conveyed said land to one Goss, which deed was duly recorded June 28, 1890, in said Emery County. On December 10, 1890, the wife of said Williams, by deed, duly relinquished her dower right in and to said land to said Goss, which deed was recorded in said county May 6, 1891. On April 8, 1892, said Goss and wife, by deed, conveyed said land to the defendant P. V. C. Co. On February 25, 1893, upon the execution and delivery of said last-named deed, the P. V. C. Co. went into possession of said land and since then, as the owner, has been in continuous and exclusive possession thereof. After the P. V. C. Co. had taken possession of said land Marks surrendered and delivered his patent issued to him to said company, which had the same recorded on March 28, 1893, in the records of Emery County. The court also found that ''for upwards of twenty-five years prior to the commencement of this suit, the defendant Pleasant Valley Coal Company has been in the actual and exclusive possession of the whole of said property, both by actual occupancy as well as under claim of title, exclusive of other right, founded upon the aforesaid deeds of conveyance,'' and that during all of said time has paid all of the taxes assessed on said land, and, ''as owner, has held and occupied the same openly, notoriously, and adversely, against the whole world and in good faith.'' We remark that the finding respecting adverse possession is assailed by the plaintiff.

As stated at the commencement of this opinion, the Railroad Co. claims title to its right of way from the United States through an act of Congress. In view that the title to the right of way of the Railroad Co. is conceded by the plaintiff, further reference to the title thereof is unnecessary.

Plaintiff also claims the paper title to said 160 acres of coal land, subject, however, to the right of way of the Railroad Co. for railroad purposes. The plaintiff's title is also deraigned from the same Stephen R. Marks from whom the P. V. C. Co. deraigns its title as aforesaid. The plaintiff's title originated in a deed from Marks dated June 12, 1913, to one C. N. Sweet, who, with his wife, thereafter, on October 1, 1915, by deed, conveyed the same to one T. A. Ketchum, and said Ketchum, on April 27, 1916, conveyed the sixty-foot strip of ground marked "A" on the plat to the plaintiff. Plaintiff claims no other right or title to said land except as just stated; but upon various grounds disputes and contests the right and title of the P. V. C. Co. The plaintiff concedes that in issuing the patent for said coal lands to Marks the title passed to him. In that connection it, however, also contends that both Williams and Goss were disqualified from acquiring or holding coal lands, for the reason that when Marks deeded to Williams and when Williams deeded to Goss both Williams and Goss had exhausted their rights to acquire and hold coal lands from the government. The plaintiff therefore contends that, in view that both Williams and Goss were, by law, prevented from acquiring coal lands, title did not pass from Marks to Williams and from Williams to Goss, nor from Goss to the P. V. C. Co., and hence said P. V. C. Co. obtained no title by means of the deeds aforesaid. Plaintiff's counsel concede that Marks was paid full consideration for the land by him conveyed to Williams, and that the P. V. C. Co. paid the full purchase price therefor, amounting to $4,000, and that Marks still retains such consideration.

From what has been said it is clear that plaintiff's attack upon the title to the lands in question is purely collateral, and that the title is not assailed upon the ground that Marks defrauded the United States government, or that he, through fraud or otherwise, prevented any one from contesting his application to enter and to purchase the coal land in question.

The question therefore arises, Can plaintiff's attack upon the title prevail? It would seem that merely to state the facts

should be sufficient to convince any one that if title to government land can successfully be assailed in collateral proceedings and upon the grounds hereinbefore outlined, then titles emanating from the United States government are frail indeed. Upon the questions hereinbefore indicated, counsel for both sides have cited and reviewed an exceedingly large number of cases which they claim are decisive of the respective views advanced by them. We have carefully examined the cases referred to by counsel and we have found none that are directly in point. It is, however, not remarkable that no case precisely in point was or can be found, since the attack upon the title of the P. V. C. Co. at this late date and under the conceded facts and circumstances of this case, to say the least, is somewhat unique. Moreover, the legal questions involved are not complicated, nor are they necessarily difficult or obscure. For the most part the questions are governed by elementary principles. In view that the numerous cases referred to by counsel are at most merely analogous, and if we undertook to refer to one we, in fairness to both sides, would be required, not only to refer to all, but, in addition thereto, would have to review and distinguish a large number of cases, we have concluded that no good purpose could be subserved in reviewing and distinguishing the many cases cited, and hence we shall refrain from citing or reviewing any of the many cases referred to in counsel's briefs. Moreover, in nearly all of the cases referred to, the attack was a direct one upon the patent instituted by the government itself. In all of those cases, however, it is made very clear that although the patent be obtained by fraud, conspiracy, etc., yet the title passes from the government to the grantee, and that a patent thus issued is voidable and not void. In the very nature of things, such must be the law. While counsel for plaintiff concede the doctrine just stated, yet they, for various reasons, insist that the present case is an exception. It is urged that in view that Mr. Marks undertook to convey the land to a disqualified person, and did so before he had made application to purchase the same, and before he paid for it, for that reason he, as a matter of law, could not, and did not, convey anything

to Williams. In that connection the fact must not be overlooked that in this case the government was not defrauded by Marks, its grantee. That is, Mr. Marks, the grantee, was legally qualified to enter and purchase the coal lands, and he paid the government the full purchase price therefor. Again, his application was contested upon the ground that he had violated the United States laws in entering the land for the benefit of another, and that question was tried out in the tribunals established for that purpose and the contest was found to be without merit. The fact is, therefore, conclusively established, at least as against one claiming title through Marks, and in a collateral attack, that Marks did not violate the law in acquiring title to the land. Nor do we think that in a collateral proceeding the title can be assailed at this late date for reasons other than those stated in the contest. Marks having obtained title to the land then, as directly held in the case of *United States* v. *Keitel,* 211 U. S. 370-389, 29 Sup. Ct. 123, 53 L. Ed. 230, the law imposed no limitations upon the right of Marks to sell the land to any one. It should also be remembered that no contention is made that either Marks or any one else prevented either Sprunt or any other person from fully contesting Marks' right to purchase the land. No fraud of any kind was practiced on Sprunt, and nothing was done to prevent him from fully presenting all the facts relating to his protest. Such being the case, the findings and decisions of the officers of the Land Office cannot now be assailed in a collateral proceeding by one claiming through or under Marks. The findings and decision in that contest are just as binding upon one claiming through or under Marks as they would be if the findings and decision had been against him.

We are also of the opinion that the contention of counsel, that in view that both Mr. Williams and Mr. Goss were disqualified from acquiring coal lands, for that reason they could neither receive nor transmit title, is not tenable. It is elementary that, whenever a person may be disqualified         3 from holding title for himself, yet he is a proper conduit through whom to pass title from one who has it to one who may legally take it. As before stated, Marks obtained the

title by a United States patent and therefore could convey good title to his grantee. If, therefore, neither Williams nor Goss could acquire the land or hold the title thereto, yet they could receive the title from a person having it and could transfer the same to any one who could lawfully take it. There is no contention, nor could it reasonably be contended, that the P. V. C. Co. merely as a corporate entity was or is disqualified from acquiring or holding title to coal lands. The contention, as before stated, however, is that, for the reasons stated, it was disqualified from acquiring the title to the lands in question. With this contention, however, for the reasons herein stated, we do not agree.

It is further urged that because Marks conveyed the land before he had made application to purchase, and before he had a right to, and had acquired, the title thereto from the government, for that reason he conveyed nothing to Williams, and Williams conveyed nothing to Goss, and the latter conveyed nothing to the P. V. C. Co. Counsel for said company, however, contend that by virtue of Comp. Laws 1907, section 1979, although Marks had not acquired the title when he conveyed the land to Williams, yet, in view that the former thereafter acquired the title, it, nevertheless, passed to his grantee. That section reads:

"If any person shall hereafter convey any real estate by conveyance purporting to convey the same in fee simple absolute, and shall not at the time of such conveyance have the legal estate in such real estate, but shall afterwards acquire the same, the legal estate subsequently acquired shall immediately pass to the grantee, his heirs, successors, or assigns, and such conveyance shall be as valid as if such legal estate had been in the grantor at the time of the conveyance."

Plaintiff's counsel contend that the foregoing section does not apply in this case. Without pausing to discuss that question further, we can perceive of no good reason why the statute does not apply here if it applies in any case, and no claim is made that the statute is not a wholesome and proper one.

We can conceive no reason, therefore, why the P. V. C. Co. did not obtain, and ever since the issuance and delivery of the deeds we have mentioned has not had, a good and indefeasible paper title to the 160 acres of land in question. In our opinion the paper title to the 160 acres of land is in the P. V. C. Co. and in no one else. Nor can we, in view of the undisputed facts, understand upon what principle Marks, and those claiming under him by virtue of the deed of 1913, can escape the P. V. C. Co.'s plea of estoppel. Marks has received and retains the full purchase price for the land. He, during all of the years aforesaid, knew that the P. V. C. Co. claimed the title thereto, and under that claim had placed more than a quarter of a million dollars worth of improvements thereon; yet, during all of the time, Marks retained the purchase price and has stood by and permitted the P. V. C. Co. to invest its money without making any claim to the land or any part thereof. Can any one doubt that Marks himself would be estopped from claiming title to the land now? If, therefore, Marks would be estopped, in view that the plaintiff, under the undisputed evidence, cannot claim as an innocent purchaser, and as it claims its title through Marks, the plaintiff, too, is estopped.

The company, however, also claims, and the district court found, that it had acquired title to the land by adverse possession under our statute. In view of what has been said respecting the paper title, it is, however, wholly unnecessary to discuss that phase of the case, and we refrain from doing so.

In view, therefore, that the title is in the P. V. C. Co., the plaintiff must acquire its right to the strip marked "A" on the plat by condemnation.

After the cause had been submitted, and after plaintiff had filed its reply brief, which was filed some time after submission and after the foregoing was written, plaintiff's counsel have specially referred us to the case of *Doepel* v. *Jones,* 244 U. S. 305, 37 Sup. Ct. 645, 61 L. Ed. 1158, which they seem to think is in their favor. We have carefully considered the facts in that case, and the opinion based thereon, and, in our judgment, the principle which controlled

the decision fully justified the conclusion we have reached. The decision in that case is based on 5 U. S. Comp. Stat. 1916, Ann., section 5025, which section reads as follows:

"It shall be unlawful for any person, for himself or any company, association, or corporation, to directly or indirectly procure any person to settle upon any lands open to settlement in the territory of Oklahoma, with intent thereafter of acquiring title thereto; and any title thus acquired shall be void; and the parties to such fraudulent settlement shall severally be guilty of a misdemeanor, and shall be punished upon indictment, by imprisonment not exceeding twelve months, or by a fine not exceeding one thousand dollars, or by both such fine and imprisonment, in the discretion of the court."

The statute seems to be limited to the territory of Oklahoma, and the case arose in that territory. Mr. Chief Justice White, in the course of the opinion, says:

"It cannot be seriously disputed that if the agreement was made by Fernow, the original applicant, that he would make the homestead entry not for himself, but for the benefit of another, would, during the time that he was apparently taking the steps to complete the entry, pay rent for the land to such other person, and when the patent was issued deed the land to such other person, such agreement caused that entry to be absolutely void for repugnancy to" the statute we have quoted.

We need not review that decision further. It is sufficient to say that the decision is based entirely upon the fact that the person who made the homestead entry did so for the benefit of another, and he agreed that upon obtaining title he would convey the same to such other person. Any title based on the entry in that case would, therefore, of necessity, be void and of no force or effect. If it be assumed, therefore, that that case states the law generally applicable in all of the states of the Union, yet the case has no application to the facts in the case at bar.

As we have before pointed out, however, counsel for plaintiff concede that the patent in the case at bar is valid and that by it the title passed from the United States to Marks. They also concede that Marks, the grantee of the government, obtained the title without committing any fraud or deception on the government, and without violating any statute. The patent on which the title of the P. V. C. Co. is based is, therefore, valid and free from all defects. Moreover, the deed

from Marks, the grantee in said patent, was also free from fraud and deception. Marks intended to convey the title to the lands in question and obtained full consideration for what he conveyed.

The only claim remaining, therefore, is that the grantee of Marks was disqualified from acquiring title to coal lands. That, however, as we have pointed out before, cannot affect the title of the P. V. C. Co. since the title necessarily passed from Marks to his immediate grantee, Williams, and from Williams to Goss, the immediate grantor of the P. V. C. Co. In the case last referred to the entry and every act based thereon were void and of no effect. Not so here. Marks' entry and the patent based thereon were valid and without any legal flaw whatever. So long as the patent issued to Marks stands, therefore, we cannot see how plaintiff can assail the title of the P. V. C. Co., which claims title through Marks and through whom plaintiff also claims title, but by a subsequent deed. It is certainly an anomaly to say that although Marks intended to convey the lands, was legally qualified to do so, and was in no way deceived or defrauded, and received full consideration therefor, he, nevertheless, retained the title until he conveyed the same in 1915 to Mr. Sweet—that he retained the title notwithstanding section 1979, supra, which we have quoted in full. We repeat that no case is cited by counsel sustaining such a claim, and certainly the last case referred to by them, which we have specially reviewed, does not even intimate anything of the kind. After again going over the matter, we are still fully convinced that the conclusions announced are sound and should prevail.

We proceed now to a consideration of plaintiff's contention that the district court erred in not condemning a portion of the right of way of the Railroad Co. for a tipple site. As before stated, the Railroad Co., by an act of Congress passed in 1872 (Act Cong. June 8, 1872, c. 354, 17 Stat. 339), obtained a right of way over the land in question 200 feet in width. Early in the '80's it located its line of railroad on said strip. Plaintiff seeks to condemn a strip approximately 70 feet in width and 1,000 feet in length lying between the

tracks marked No. 3 and No. 4 on the plat. A portion of such strip extends beyond the northerly boundary of the right of way into the P. V. C. Co.'s land. In case, however, that the plaintiff is not permitted to condemn that portion of the proposed tipple site which is on the right of way of the Railroad Co., the portion lying on the P. V. C. Co.'s land is of no importance whatever.

We shall therefore confine this discussion to that portion of the proposed tipple site which is on the Railroad Co.'s right of way. Among other things, the Railroad Co. contends that our statute does not confer the right on the plaintiff to condemn land for a tipple site.

While we are of the opinion that our statute gives the right to condemn sufficient ground for a tipple site, yet, in our opinion, neither under our statute, nor under the law generally, can the plaintiff condemn any portion of a right of way used for railroad purposes for a tipple site. Comp. Laws 1907, section 3590, subd. 5, reads:

"All rights of way for any and all purposes mentioned in section 3588, and any and all structures and improvements thereon, and the lands held or used in connection therewith, shall be subject to be connected with, crossed, or intersected by any other right of way or improvement or structure thereon; they shall also be subject to a limited use in common with the owners thereof, when necessary; but such uses of crossings, intersections, and connections shall be made in the manner most compatible with the greatest public benefit and the least private injury."

By referring to the provision just quoted, it will be seen that every right of way, as it is expressed in the statute, is "subject to be connected with, crossed, or intersected by any other right of way." And further: "They [the rights of way] shall also be subject to a limited use in common with the owners thereof, when necessary." The statute then prescribes the manner of use of the "crossings, intersections, and connections." The statute thus limits the interference with rights of way to "crossings, intersections, and connections" by other rights of way. True, it makes a right of way also subject "to

a limited use in common with the owners thereof," but such use is clearly and manifestly a use for which the original right of way was obtained and is being used, and no other. If the statute were given any other construction, then, as we shall see, all rights of way might be diverted from the original use. There is nothing in the statute conferring the right upon any person, natural or artificial, to condemn a right of way which is devoted to a quasi public use by a common carrier for a purpose other than for a similar purpose, and then only to connect with, to intersect, or to cross over the established right of way. The "structures or improvements" on the right of way are made subject only to be interfered with for the "crossings, intersections, and connections" mentioned in the statute, and for the purpose only of another right of way which is devoted to the business of transportation under the law applicable to common carriers, and for that purpose it may be used to a limited extent in common with the owner thereof. That is, such is the limitation applicable to the facts of this case, regardless of what they may be in some other case under different circumstances. The statute thus comports with common sense as well as with the experience of all men. The plaintiff does not seek merely to intersect, connect with, or to cross the right of way of the Railroad Co., but what it seeks to do is to appropriate a longitudinal strip of the right of way approximately 1,000 feet in length by seventy feet in width for the purpose of erecting permanent structures thereon to be used exclusively in plaintiff's business of screening, grading, handling, and loading coal, which it seeks to place on the market for sale. If such a right may be exercised by one person, it necessarily follows that it may be by other persons similarly situated, and hence a railroad right of way could be devoted to purposes entirely foreign to that for which it was granted to the railroad company. Instead of being devoted to the business of transporting freight and passengers under the laws applicable to a common carrier and thus serving the interests of the public generally, the right of way could be condemned for the use of one person only so long as such person was engaged in what is known as a quasi public

business, such as mining and distributing coal. Moreover, any shipper who is engaged in a quasi public enterprise could also acquire a right to a portion of a railroad right of way to accommodate his business to the detriment of the business for which the right of way was originally obtained. Every railroad company, as a common carrier carrying on the business of transportation, is, by the law, required to devote its right of way to that and to no other purpose. It cannot voluntarily surrender or give away any part of its right of way to be devoted to other purposes, although such other purpose may, in some way, affect and benefit a considerable portion of the public, as is the case in the establishment of grain elevators, etc. If it be once conceded that a coal company may condemn a portion of a right of way for a tipple site to construct tipples which are used for the purpose of screening, grading, handling, and loading coal on cars, then why may not an elevator company likewise condemn a portion of a right of way to construct buildings to be used for the purpose of cleaning, grading, handling, and loading wheat, corn, and other agricultural products? The law imposes a duty upon every railroad company that is engaged in the business of a common carrier to provide reasonably adequate facilities to all shippers to load and unload all kinds of freight, including coal, live stock, and grain. To obtain such facilities it is not necessary for any shipper, dealer, or manufacturer to condemn any portion of the right of way. If, therefore, it be necessary for the coal company to screen and grade its coal before it can be marketed, the company must provide not only the structures, machinery, and appliances necessary for that purpose at its own expense, but it must also obtain the ground upon which the structures are erected and the appliances used outside of the right of way of the railroad's right of way which is already devoted to purposes which can only be subjected, as the statute expresses it, for connections, crossings, and intersections of other rights of way. If any part of the railroad right of way, either with or without the consent of the railroad company, could be used for permanent structures, such as coal tipples, elevators, mills, etc., then it might well

be that these things not only might directly interfere with the business of transportation carried on by the railroad owning the right of way, but they might also interfere with that business by preventing the necessary intersections, crossings, or connections of other railroads to be made, and thus the purpose of the statute would be nullified.

Nor does it affect the question that, by reason of lack of proper ground space, tipple sites are not readily obtainable by the plaintiff. As pointed out, whenever a railroad company enters into the business of a common carrier it must provide reasonable means of access to its lines, tracks, and cars, not only to one shipper and for one kind of freight, but for all shippers and for all kinds of freight. If it becomes necessary to construct more extensive spurs and side tracks in order to accommodate the shippers and to facilitate transportation, the spurs and the side tracks must be built. One shipper, whatever his supposed needs may be, may, however, not condemn a part of a right of way for his own needs and thus hamper the railroad company in discharging its duties to all other shippers.

Without pausing to discuss the question further, we are clearly of the opinion that the plaintiff may not condemn any portion of the right of way for a tipple site, regardless of whether the location desired by it for that purpose on the right of way of the Railroad Co. would be most convenient, and would indirectly benefit the public by permitting the plaintiff to ship coal at a cost less than it otherwise can.

In this connection counsel for both sides have again cited a large number of authorities to which, in our judgment, it is not necessary to refer.

In what we have said respecting the right to condemn a portion of the railroad right of way, we do not mean to be understood as laying down any hard and fast rule respecting that matter. All that it is necessary to decide, and all that we do now decide, is that a right of way, based upon a grant by Congress, which is devoted to the business of transportation by a common carrier, cannot, either with or without the consent of such carrier, be devoted to

permanent structures such as the plaintiff desires to erect on the right of way belonging to the Railroad Co. Nor do we desire to be understood as laying down a rule regarding the duties of common carriers and the rights of the shipper, except in general terms, as before indicated. In case a shipper requires greater facilities, whether it be more cars, or more tracks, he may apply to the proper commissions created by law, who will hear his case. In case those commissions fail to grant the desired relief, the courts are always open and accessible to review the acts of those commissions on questions of law.

Nor is there anything contrary to the principles herein announced in the case of *Postal Tel. & Cable Co.* v. *O. S. L. R.,* 23 Utah, 474, 65 Pac. 735, 90 Am. St. Rep. 705. In that case a portion of the right of way was permitted to be condemned for another right of way. The right of way sought to be condemned was intended to be devoted to the business of a common carrier. It is well settled that the business of a telegraph company is that of a common carrier. Moreover, the space or area of the right of way condemned in that case was insignificant and could in no way interfere with or impede the business of the railroad company.

The district court, therefore, committed no error in denying plaintiff the right to condemn any portion of the right of way owned by the Railroad Co.

While plaintiff has also assigned error respecting the court's ruling and order that the sixty-foot strip of ground which the court ordered condemned should not extend farther than within five feet of the outer rail of track No. 4, yet comparatively little space is devoted to that proposition in plaintiff's brief. Counsel, however, insist that the court's order in that regard constitutes error. Upon that question the evidence was that the plaintiff had constructed a "coal bin" near track No. 4 from which it loaded coal onto the cars of the railroad company, and that the bin was built so near to the track that it was a menace and a danger to the men who were employed to operate and switch the cars on track No. 4. The evidence also showed that a clearance space

of five feet between the outer rail and any structure built near the track was necessary to safely operate trains and switch cars over the track. It was also shown that while track No. 4 departs from the original right of way at the point where the sixty-foot strip joins the original railroad right of way as indicated on the plat, yet that track No. 4 always was, and is being, used as though it were on the original right of way. In that regard the court specially found:

"And the court further finds that said track 4, mentioned in the pleadings and evidence herein, at the time of the commencement of this action, was, and long prior thereto had been, and now is, dedicated, appropriated, and devoted to a public use, together with a clearance space or strip of not less than five feet parallel to and from the outer edge of the north or northerly rail of said track 4."

So far, therefore, as shippers are concerned, track No. 4, including the five-foot strip, must be regarded and treated as though it were actually located on the original right of way.

As we have hereinbefore pointed out, shippers are not required to condemn rights of way extending them onto railroad grounds. Nor are they required to approach nearer to the tracks than is necessary to load and unload their freight. It is apparent to any one that, in order to avoid danger to the railroad employees in operating trains and in switching cars, there must of necessity be a clearance space extending some distance beyond the outer rail of every railroad track. The court found that five feet clearance was necessary. It would seem that that space is a most reasonable one since the cars extend about two and one-half to three feet beyond the rail, and in addition to that there must be sufficient room for a man to pass between the cars and any structure that may be erected along the track. That room is also necessary for the safety of the railroad brakemen who may be required to stand on the ladders attached to the cars. Indeed, the necessity for such a space is so apparent and so general that a court could well take judicial notice of its necessity and extent. In view that every shipper must be given the right and afforded the opportunity to load his freight and the opportunity to unload the same

from the cars of a common carrier, and the carrier must provide sufficient room or space for that purpose, no shipper can be required to condemn any grounds except for the purpose of erecting permanent structures thereon to store his freight or to prepare it for shipment. In erecting such structures he may, however, not encroach upon the right of way of the common carrier, nor may he place structures so near the track as to make them a menace and a danger to the operatives of the railroad. There is absolutely no necessity, therefore, for the plaintiff to condemn any ground except for permanent structures. Under the judgment and order of the court it may erect structures extending the full width of the sixty-foot strip condemned, and it may erect them within five feet of the outer rail of track No. 4, which the court found has always been and is being used for railroad purposes. The plaintiff is permitted to reach the railroad track at any point on the sixty-foot strip, and there is no room for the contention that it would have to become a trespasser to reach the railroad track. No one, not even the owner of the ground, could now prevent the Railroad Co. from using track No. 4 the same as all other tracks, and hence could not interfere with any shipper. For aught that appears, however, in the record, the Railroad Co. has a perfect right to use and maintain track No. 4 the same as any other track. If, however, it lacked title, the owner thereof, the P. V. C. Co., under the evidence and finding of the court could not now interfere with the use and maintenance of track No. 4, but the most that that company would be entitled to would be to recover from the Railroad Co. the value of the ground occupied by track No. 4. What the rights as between the Railroad Co. and the P. V. C. Co. may be, however, does not in the least concern the plaintiff, since, as we have seen, it may construct any permanent building to within a proper distance of the railroad track, and may thus have use of the railroad precisely the same as though it were permitted to condemn to the outer rail of the track. Indeed, if it were permitted to condemn ground nearer to the track, it would be permitted to do that without any benefit to it or to any one, since it would not be permitted to so use its ground

as to make it a menace and a danger to the railroad employees as before stated. The plaintiff would, therefore, merely be required to condemn and pay for what it could not use. Nor will the Railroad Co. under the law, be permitted to hereafter move its track so as to inconvenience the plaintiff.

We have perhaps devoted more space to this assignment than was necessary, but we did so in order to make clear the want of merit to the contention that the district court deprived the plaintiff of any rights, and that neither the Railroad Co. nor the P. V. C. Co. in any way can reap an advantage from the ruling and order of the court.

As before stated, all that we are called on to decide, and all that we do decide, is that the law does not authorize the plaintiff to condemn any portion of the right of way for a tipple site; and although the track may depart from the original right of way, yet the track, being used in legitimate traffic, cannot be devoted by the plaintiff to its exclusive right.

It is further contended by plaintiff that the court erred in admitting and in excluding evidence during the progress of the trial. In view of the foregoing conclusions, however, none of those assignments could affect the result, and it is therefore unnecessary for us to discuss any of them.

The defendant P. V. C. Co. has, however, assigned cross-errors, and now insists that the district court erred in condemning the sixty-foot strip down to within five feet of the outer rail of track No. 4. It is contended in that regard that the tramway that is to be used on the strip is to be constructed and operated on an incline of twenty-five per cent.; that the operation of the tramway on such an incline is dangerous, and that the plaintiffs at a cost which is great, but not prohibitive, could obtain tipple grounds and could transport its coal from its mine to the railroad tracks in a safer manner at least at two other points. The court has found the facts against the contention of the P. V. C. Co. in that regard, and there is no, contention that there is not sufficient evidence to sustain the court's findings. Indeed, there is ample evidence to sustain the findings of the court, not only in that particular but in all other particulars.

From what has been said, it follows that the contentions of neither party should prevail, and therefore the judgment of the district court should be, and it accordingly is, affirmed at appellant's costs.

McCARTY, CORFMAN, and THURMAN, JJ., concur.

GIDEON, J.

I concur in the result affirming the judgment of the district court, but in doing so I desire to say that, while I agree with the conclusions of the Chief Justice that the P. V. C. Co., merely as a corporate body, is and was authorized to take and hold title to coal land, yet I am unable to agree that such coal company was qualified to take title to the particular lands in question at the dates of the conveyances to it. From the undisputed facts that one of the original incorporators of the coal company (Wood), and that both Williams and Goss (Goss being a stockholder on the date of the conveyance to him) had exercised their right to select and file upon lands belonging to the government as coal lands, and each had subsequently acquired title to 160 acres of such lands, I am unable to arrive at any other conclusion, under R. S. U. S. 1875, section 2350 (U. S. Comp. St. 1916, section 4662), than that not only Williams and Goss, but the coal company as well, were not qualified entrymen at the date of the Marks patent, or at the date the conveyance was made to either of them. I do not think, however, that the appellant should be adjudged to own the land sought to be condemned or to question the title of the coal company thereto. I base that conclusion on what appears to me from the record to be an undisputed fact, that—whether or not Marks at the date of his original entry, made the same in good faith to acquire the land for himself—from the subsequent acts of all the parties and the dates of the conveyances but one conclusion can be drawn, and that is that he, Marks, the original entryman, Williams and Goss, intermediary grantors, and the P. V. C. Co. were all parties to the agreement or understanding that Marks should acquire title to these lands for the benefit of the coal company and not for himself.

As they all participated in the conspiracy, and the entryman Marks received and retained the consideration to which his agreement entitled him, plaintiff should not now be permitted to make any claim based upon his part in that conspiracy. In other words, this court should not assist the plaintiff, as the grantee of Marks, but should leave the parties just where they have placed themselves. In my judgment the decree refusing to adjudicate plaintiff to be the owner of the premises should be based upon that reason, and not upon the ground that the coal company was legally entitled or authorized to receive and hold the title to the premises in question.