2012 UT 74

**PIONEER BUILDERS COMPANY OF NEVADA, INC. aka Pioneer Builders of Nevada aka Pioneer Builders, Plaintiff and Appellant,**

v.

**K D A CORPORATION aka KDA Corporation aka K.D.A. Corporation aka The K.D.A. Corporation aka K.D.A. Corporation, Inc.; et al., Defendants and Appellees.**

No. 20110050.

Supreme Court of Utah.

Nov. 2, 2012.

674

Attorneys:[1] Bradley L. Tilt, Salt Lake City, for appellant.

Miles P. Jensen, Logan, for Anderson appellees.

Josh M. Chambers, Logan, for appellees Taylor and Jensen.

Chief Justice DURRANT, opinion of the Court:

## INTRODUCTION

¶ 1 This case requires us to consider what constitutes constructive notice of unrecorded interests in real property under section 57–3–103 of the Utah Code (Recording Statute). Pioneer Builders (Pioneer) financed the purchase of an RV park (Property). At that time, the Property was subject to several existing recorded leases. But the Property was also subject to several unrecorded leases. When Pioneer attempted to foreclose on the property, some of the owners of the unrecorded leases (Defendants[2]) argued that Pioneer could not foreclose on their lots be-

cause their interests in the Property were superior to Pioneer's.

¶ 2 The district court granted the Defendants' motions for summary judgment in their entirety and granted Pioneer's motion for summary judgment in part. The court found that, although Pioneer was entitled to foreclose on its loans, Pioneer had actual and constructive notice of the unrecorded leases. Accordingly, the district court concluded that Pioneer's interest in the Property was inferior to the interests of the Defendants. Pioneer argues that the district court incorrectly applied the standard for constructive notice and asks us to reverse the district court's decision. Pioneer also argues that the district court erred in concluding that Pioneer's interest in Parcel 25,[3] which is part of the Property, is inferior to the interests of the Defendants. Further, Pioneer asks us to conclude that language in some of the Defendants' purchase contracts prevents them from having an interest in the Property until their contracts are paid in full. And finally, Pioneer asks us to reverse the district court's findings because the Defendants made references in their pleadings to Pioneer's possible insurance coverage.

¶ 3 We reverse the district court's grant of summary judgment in favor of the Defendants and remand for further proceedings. First, we conclude that the district court applied an incorrect legal standard regarding constructive notice and conflated the issue of whether Pioneer had notice of any *recorded* leases with whether it had notice of the *unrecorded* leases at issue. Accordingly, we remand this case so that the district court may conduct further proceedings consistent with the legal standard we clarify in this opinion. Second, although we agree with much of the district court's analysis regarding Parcel 25, we conclude that further proceedings are required to determine whether any of the Defendants have interests in Parcel 25 that are superior to Pioneer's. Third, we conclude that, regardless of the language

1. Because there are many defendants and appellees involved in these proceedings, there are also many attorneys. We therefore list only the counsel who presented oral arguments before this court.

2. Only some of the defendants named in the foreclosure action opposed Pioneer's summary judgment motion. In this opinion, we refer to them collectively as the Defendants.

3. *See infra* ¶ 4 n.4.

in some of the Defendants' purchase contracts, the Defendants obtained an interest in the Property even though their contracts have not yet been paid in full. And fourth, because Pioneer failed to show any prejudice resulting from the Defendants' references to Pioneer's insurance coverage, we decline to reverse on that basis.

## BACKGROUND

¶ 4 The parties in this case have competing interests in the Property. The Property consists of forty acres of real property near Bear Lake in Rich County, Utah. It is divided into four parcels, which we refer to as Parcel 25, Parcel 36, Parcel 37, and Parcel 38.[4] In 1988, KDA Corporation (KDA) owned the Property and converted it into Sunrise Village RV Park. KDA filed various documents for its park (Sunrise Village Documents) with the Rich County Recorder. The Sunrise Village Documents include regulations, maps of the Property, and rules about membership in the park, and specifically state that the Sunrise Village RV Park is "an integrated development with multiple lot owners or leaseholders." Consistent with these documents, KDA sold several one-hundred-year leases on the Property. Each of these leases describe the leased property by site number, and some of them were recorded.

¶ 5 In the meantime, United West was considering purchasing the Property. Steve Baugh, an agent of United West, commissioned an appraisal report on the Property. Mr. Baugh commissioned the report to induce Ralph Call, who is Mr. Baugh's brother-in-law and the president of Pioneer, to finance the purchase.[5] The final appraisal report (Appraisal Report or Report), dated December 29, 2000, is fifty-seven pages long, including a two-page cover letter. Additionally, twelve pages of addenda are attached. But Pioneer asserts that it only received the first two pages of the Report.

¶ 6 The cover letter of the Report states that "[t]his letter of transmittal is only that and should not be used as a letter appraisal," and concludes that "as of November 14, 2000," the value of the property was $6,630,000. On page six, the report explains that a particular part of the Property "consists of 52 lots ... sold on a membership in an owners' association that will take control after the sale of all the middle lots—there are 24 lots remaining unsold (the land is on a 99 year lease)." Further, a site map within the addenda (Site Map) is titled "Sunrise Village R.V. Park" and shows "SOLD" stamped across twenty-eight sites.

¶ 7 On October 17, 2000, KDA and United West executed a "purchase and sale agreement" conveying three of the four parcels of the Property to United West. The fourth parcel of the Property, Parcel 25, was not included in the agreement, and the parties dispute whether this was an accidental oversight. On November 13, 2000, KDA conveyed the three parcels to United West via warranty deed (Warranty Deed). The Warranty Deed states that KDA conveyed the three parcels "[s]ubject to all ... agreements, memberships, leases and right of ways [sic] of record."

¶ 8 In connection with this conveyance, Pioneer made its first loan to United West. As security for repayment of this loan, United West executed a "Trust Deed with Assignment of Rents" (Trust Deed; together with the Warranty Deed, Original Deeds), dated November 13, 2000, under which United West is the trustor and Pioneer is the beneficiary. The Trust Deed includes a copy of the legal description of the Property conveyed by the Warranty Deed, which conveyed only three parcels. On November 17, 2000, Pioneer recorded its Original Deeds.

¶ 9 In April of 2001, Mr. Call and Mr. Baugh personally visited the Property. The Defendants state that, by that time, the Defendants had made a variety of visible improvements to the Property. But Pioneer

---

**4.** Our designations are shortened versions of the following full parcel numbers: Parcel 41–08–00–025 (Parcel 25); Parcel 41–08–00–036 (Parcel 36); Parcel 41–08–00–037 (Parcel 37); and Parcel 41–08–00–038 (Parcel 38).

**5.** Although Pioneer now disputes that the Appraisal Report was commissioned to induce Pioneer to make a loan, the district court found this to be an undisputed fact.

asserts that very few of those improvements were visible on that visit. Specifically, Mr. Call stated that there was snow on the ground when he visited the Property, and that he saw only "four or five" recreational vehicles and a "few concrete slabs in scattered places."

¶ 10 On about August 13, 2001, Pioneer loaned additional money to Pine Ridge, a successor to United West. As security for this additional loan, Pine Ridge executed a "Modification of Trust Deed" in favor of Pioneer, which stated that it was "made . . . for purposes of changing the named trustor and amount secured," and a second "Trust Deed" (together, Modification Deeds). The Modification Deeds conveyed the three parcels that KDA had previously conveyed to United West, and additionally purported to convey Parcel 25, even though KDA had not yet conveyed Parcel 25 to United West or Pine Ridge. Pioneer recorded its Modification Deeds on August 14, 2001.

¶ 11 On September 24, 2002, Laren Nalder, an employee of the title company that was a party to the Original Deeds, recorded an "Affidavit Concerning Recorded Instruments" (Nalder Affidavit). The Nalder Affidavit purports to "correct" the Original Deeds by retroactively including Parcel 25 in the legal description of the property conveyed. More than two years later, on March 9, 2005, KDA conveyed Parcel 25 to Pine Ridge through a quit claim deed (Quit Claim Deed) as part of a settlement in this case. Pine Ridge recorded the Quit Claim Deed on March 14, 2005.

¶ 12 Meanwhile, at various times since 1989, the Defendants purchased their interests in the Property. Some of them purchased their interests before Pioneer recorded its Original Deeds. Others purchased their interests after Pioneer recorded its Modification Deeds, but before the Nalder Affidavit was filed. Some of the Defendants (Parcel 25 Defendants) purchased interests in Parcel 25. And some of the Parcel 25 Defendants (Payment Defendants) purchased their interests under purchase contracts providing that they would "receive a certificate of ownership when [the] contract is paid in full." Although none of the Defendants re-

corded their interests in the Property before Pioneer initiated the foreclosure proceedings, many of the Defendants have recorded their interests since then.

¶ 13 Ultimately, Pine Ridge failed to make its payments under the Trust Deed and Pioneer initiated an action to foreclose on the Property. Pioneer moved for summary judgment on its attempted foreclosure against the Defendants, asserting that, because it recorded its Original Deeds before any Defendant recorded its interest, Pioneer's interest in the Property is superior to the Defendants' interests. Pioneer also noted that the Payment Defendants' purchase contracts provide that they will "receive a certificate of ownership when [the] contract is paid in full" and argued that the Payment Defendants do not have any interest in the Property because they have not yet paid in full. The Defendants filed cross-motions for summary judgment, asserting that their rights in the Property are superior to Pioneer's.

¶ 14 Over the course of the proceedings, the district court issued several decisions and orders, three of which are relevant to this appeal. First, the court issued a memorandum decision on May 10, 2007 (Initial Order). In that order, the court found that Pioneer's interest in the Property was inferior to the interests of the Defendants because Pioneer had constructive notice of the Defendants' interests in the Property. The court's conclusion was premised on the following undisputed facts: (1) Pioneer had actual knowledge of the Defendants' uses and improvements of the Property; (2) the Sunrise Village Documents filed with the county recorder indicate that the Property was subdivided into sites that could be leased, and some of those leases were actually recorded; and (3) Pioneer had access to the Appraisal Report, which indicates that the Property was encumbered by leases.

¶ 15 The court also held that the Parcel 25 Defendants' interests in the Property were superior to Pioneer's because Pioneer did not have an interest in Parcel 25 when the Parcel 25 Defendants purchased their leaseholds. In reaching this conclusion, the court found that Pioneer's interest in Parcel 25 was not

recorded when the Parcel 25 Defendants purchased their interests, Pioneer's Modification Deeds did not impart record notice of Pioneer's interest in Parcel 25, and the Nalder Affidavit was not retroactive. Ultimately, the court granted Pioneer's summary judgment motion in part, concluding that Pioneer was entitled to recover the amount it was owed. But the court granted the Defendants' summary judgment motions in their entirety. Thus, although the court held that Pioneer was entitled to foreclose on the property, it held that the foreclosure would be subject to "all interests claimed by the Defendants."

¶ 16 Second, the court issued a second corrected judgment (Second Corrected Judgment) on January 6, 2009. In that judgment, the court reiterated many of its previous findings, including its conclusions that the Warranty Deed did not convey Parcel 25 and that the Nalder Affidavit did not cure Pioneer's defective title to Parcel 25. And third, the court issued an order (Payment Order) in which it found that the Payment Defendants' failure to pay their contractual amounts in full did not affect the priority of the interests in the Property.

¶ 17 In sum, the court found that the Defendants' interests in the Property were superior to Pioneer's.[6] Specifically, regarding Parcels 36, 37, and 38, the court concluded that Pioneer's interest was inferior to the interests of the Defendants because it had inquiry notice of the Defendants' interests in those parcels. Regarding Parcel 25, the court concluded that Pioneer's interest was inferior to the interests of the Parcel 25 Defendants because Pioneer did not acquire Parcel 25 until after the Parcel 25 Defendants had purchased their interests.

¶ 18 We have jurisdiction to hear this matter pursuant to section 78A–3–102(3)(j) of the Utah Code.

6. The court identified a few exceptions, which were based upon uncertainties regarding whether particular lots were located on Parcel 25 and are not relevant to our analysis in this opinion.

7. *Gudmundson v. Del Ozone*, 2010 UT 33, ¶ 44, 232 P.3d 1059 (quoting UTAH R. CIV. P. 56(c)).

## STANDARD OF REVIEW

¶ 19 Summary judgment is proper only if " 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.' " [7] "We review the district court's grant of summary judgment for correctness, according no deference to its legal conclusions." [8] We "review[ ] the same paper record that was before the [district] court to decide whether there are genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law." [9]

## ANALYSIS

¶ 20 The central issue in this case is whether a party who purchases property knowing that the property is encumbered by recorded leases is charged with constructive notice of unrecorded leases that also encumber the property. First, we consider whether the ability to identify unrecorded interests gives rise to a duty to do so. Second, we consider various issues related to Pioneer's interest in Parcel 25. Specifically, we consider (1) whether recording a wild deed imparts record notice to a subsequent purchaser that there is a competing interest in the property, (2) whether omitting a parcel of property from a conveyance is a minor typographical or clerical error that can be corrected by filing an affidavit, (3) whether a retroactively validated interest can defeat the interests of competing interest holders who recorded their interests before the retroactive validation occurred, and (4) whether a party who purchases property under an executory real estate contract obtains an interest in the property before the contract has been paid in full. Third, we consider whether the Defendants' references to Pioneer's insurance coverage warrant a reversal of the district court's decision.

8. *Warne v. Warne*, 2012 UT 13, ¶ 11, 275 P.3d 238.

9. *Bahr v. Imus*, 2011 UT 19, ¶ 17, 250 P.3d 56.

I. BECAUSE IT CONFLATED THE QUESTION OF WHETHER PIONEER HAD NOTICE OF RECORDED LEASES WITH THE QUESTION OF WHETHER PIONEER HAD NOTICE OF THE DEFENDANTS' UNRECORDED LEASES, THE DISTRICT COURT ERRED WHEN IT CONCLUDED THAT PIONEER HAD CONSTRUCTIVE NOTICE OF THE DEFENDANTS' UNRECORDED LEASES

¶ 21 The district court granted summary judgment to the Defendants because it found that Pioneer had constructive notice of the Defendants' unrecorded leases. We agree that Pioneer had notice that the Property was encumbered by leases. But because we conclude that the undisputed facts do not establish that Pioneer had constructive notice of the Defendants' unrecorded leases, we reverse the district court's grant of summary judgment and remand for further factual findings.

¶ 22 In the context of recording interests in real property, Utah is a race-notice jurisdiction.[10] The Recording Statute provides as follows:

Each document not recorded as provided in this title is void as against any subsequent purchaser of the same real property, or any portion of it, if:

(1) the subsequent purchaser purchased the property in good faith and for a valuable consideration; and

(2) the subsequent purchaser's document is first duly recorded.[11]

Thus, where two purchasers claim title to real property, the subsequent purchaser prevails so long as he took the property in good faith and was the first to record his interest.[12]

¶ 23 We have held that, to take property "in good faith, a subsequent purchaser must take title to the property without notice of a prior, unrecorded interest in the property." [13] Notice of a prior interest may be actual or constructive.[14] "Actual notice arises from actual knowledge of an unrecorded interest or infirmity in the grantor's title." [15] And constructive notice may result from record notice or inquiry notice.[16]

¶ 24 Record notice "results from a record or is imputed by the recording statutes." [17] The Recording Statute provides that documents and instruments filed with the county recorder "impart notice to all persons of their contents." [18] Thus, when documents filed with the county recorder disclose an interest in a particular property, a subsequent purchaser has record notice of the competing interest and does not take in good faith.

¶ 25 On the other hand, inquiry notice is imparted to a subsequent purchaser who has "actual knowledge of certain facts and circumstances that are sufficient to give rise to a duty to inquire further." [19] We have held that "[w]hatever is notice enough to excite attention and put the party on his guard and call for inquiry is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it." [20] Further, we have explained

10. *Ault v. Holden*, 2002 UT 33, ¶ 31 & n. 10, 44 P.3d 781.

11. Utah Code § 57-3-103.

12. *Ault*, 2002 UT 33, ¶ 31, 44 P.3d 781; *see also* Utah Code § 57-3-103.

13. *Haik v. Sandy City*, 2011 UT 26, ¶ 14, 254 P.3d 171 (alteration omitted) (internal quotation marks omitted).

14. *Id.*

15. *Id.* (internal quotation marks omitted).

16. *Id.*

17. *Id.* (alteration omitted) (internal quotation marks omitted).

18. Utah Code § 57-3-102(1) ("Each document executed, acknowledged, and certified, in the manner prescribed by this title, ... shall, from the time of recording with the appropriate county recorder, impart notice to all persons of their contents.").

19. *Haik*, 2011 UT 26, ¶ 14, 254 P.3d 171 (alteration omitted) (internal quotation marks omitted).

20. *First Am. Title Ins. Co. v. J.B. Ranch, Inc.*, 966 P.2d 834, 838 (Utah 1998) (internal quotation marks omitted).

that a subsequent purchaser may not "shut his eyes or his ears to avoid information" or "remain wilfully ignorant" of facts that give rise to a duty to inquire.[21]

■ ¶ 26 Accordingly, our inquiry notice analysis involves two steps. First, we conduct a subjective inquiry to determine what actual knowledge the subsequent purchaser had at the time of the purchase.[22] Second, we conduct an objective inquiry to determine whether those facts would lead a reasonable person to inquire further.[23]

■ ¶ 27 We conclude that, under our two-step inquiry notice analysis, a purchaser's observations do not put him "on his guard and call for inquiry"[24] when they are consistent with what he expected to find on the property. Thus, a purchaser's observation of tenants on a property can impart notice of unrecorded interests only if the purchaser did not reasonably expect to find the tenants there. In other words, when a purchaser knows that a property is encumbered by recorded interests, the purchaser's observation of tenants on the property does not in itself give rise to a duty to inquire whether unrecorded interests also encumber the property.

¶ 28 Applying the two-step inquiry notice analysis, we have charged subsequent purchasers with constructive notice of unrecorded interests when the purchaser's observations, together with other available information, would have alerted a reasonable person that further investigation was warranted. For example, in *Arnold Industries, Inc. v. Love,* we considered whether a purchaser had inquiry notice of an easement when the purchaser's deed conveyed the property subject to any easements "now of [r]ecord," but a title search did not reveal the recorded deed that described the easement because the deed had been improperly indexed.[25] We first concluded that the purchaser had observed an easement holder's "open and obvious" use of the easement.[26] Second, we determined that this gave rise to his duty to inquire further within the public record, which would have revealed the deed describing the easement.[27]

¶ 29 But in *Stumph v. Church,* the Utah Court of Appeals reached the opposite result.[28] In that case, it considered whether a purchaser's observation of tenants occupying property imparted inquiry notice that property he had purchased was subject to unrecorded deeds.[29] First, the court concluded that the subsequent purchaser knew that tenants occupied the property.[30] But second, because the purchaser knew that the property was being leased to renters, the court determined that there was nothing about his observations that would have alerted him that further inquiry was required.[31] The court reasoned that because he "expected to

**21.** *Salt Lake, Garfield & W. Ry. Co. v. Allied Materials Co.,* 4 Utah 2d 218, 291 P.2d 883, 885–86 (1955) (internal quotation marks omitted).

**22.** UTAH CODE § 57-3-103 (providing that a subsequent purchaser has a superior interest in property if he recorded his interest first and "purchased the property in good faith"); *see also, e.g., First Am. Title,* 966 P.2d at 837 (noting that inquiry notice "is presumed" when "a person has knowledge of certain facts which should impart to him, or lead him to, knowledge of the ultimate fact" (internal quotation marks omitted)).

**23.** *See First Am. Title,* 966 P.2d at 837 (noting that inquiry notice "can occur when circumstances arise that should put a reasonable person on guard so as to require further inquiry on his part" (internal quotation marks omitted)).

**24.** *Id.* at 838 (internal quotation marks omitted).

**25.** 2002 UT 133, ¶¶ 28–29, 63 P.3d 721.

**26.** *Id.* ¶ 30.

**27.** *Id.* ¶¶ 31–33; *see also Allied Materials,* 291 P.2d at 885–86 (concluding first that a subsequent purchaser had actual knowledge of poles, guy wires, and trolley wires on the property, and second, that the purchaser's actual knowledge, coupled with the fact that one deed in the property's chain of title explicitly referenced a court decree that granted an easement to a railroad company, imparted to the subsequent purchaser inquiry notice of the railroad company's easement).

**28.** 740 P.2d 820 (Utah Ct.App.1987).

**29.** *Id.* at 822.

**30.** *Id.*

**31.** *Id.*

find, and did find, persons occupying the premises as tenants," he "did not have a duty ... to inquire as to the identity of the landlord or ask to see a copy of the lease or rental agreement" to discover the identity of the actual landlord.[32]

¶ 30 In this case, the district court concluded that Pioneer had actual and constructive notice of the Defendants' interests in the Property. Specifically, the court concluded that Pioneer had actual knowledge of the following undisputed facts, which gave rise to a duty to inquire further regarding whether there were unrecorded leases on the Property: Pioneer had actual knowledge of the Defendants' uses and improvements of the Property; the Sunrise Village Documents filed with the county recorder indicate that the Property was subdivided into sites that could be leased, and some of those leases were actually recorded; and Pioneer had access to the Appraisal Report, which indicates that the Property was encumbered by leases. For the reasons discussed below in sections (A) and (B), we conclude that neither Pioneer's observations nor the Sunrise Village documents were sufficient to impart to Pioneer inquiry notice of the Defendants' unrecorded leases. Accordingly, we reverse the district court's grant of summary judgment. But as discussed in section (C), because we conclude that the Appraisal Report contains information that would have imparted constructive notice of the Defendants' interests, we remand this issue for further proceedings so that the court may make factual determinations and resolve this issue.

A. *Because Pioneer's Observations of Improvements on the Property Were Consistent with Its Knowledge that the Property Was Encumbered by Leases, Its Observations Did not Impart Inquiry Notice of the Defendants' Unrecorded Leases*

¶ 31 Pioneer's president, Ralph Call, testified that he visited the Property in April

of 2001 and saw a few of the improvements that had been made to individual lots. Specifically, Mr. Call stated that he saw "at most ... four or five recreational vehicle camper trailers parked in various spots," and "a few concrete slabs in scattered places." The district court found that these observations gave Pioneer "actual knowledge of the Defendants' uses and improvements of the property" and concluded that this knowledge imparted to Pioneer inquiry notice of the unrecorded leases.

¶ 32 The court reasoned that because Pioneer knew that some of the lots had been leased, it "could simply check membership records or even count the 'unsold lots' from the total platted to determine if the improvements were on lots that had been recorded or not." In other words, the court concluded that Pioneer had a duty to compare the locations of the improvements it observed against the locations of the recorded leases to determine if the improvements were located on sites for which no leases had been recorded. But Pioneer argues that Mr. Call's observations were consistent with what he expected to find when he visited the Property, and that his observations therefore did not impart inquiry notice of the unrecorded leases. We agree.

¶ 33 Under the Recording Statute, Pioneer's interest in the Property is superior to the Defendants' interests only if Pioneer purchased the Property in good faith and without notice of the Defendants' interests.[33] And as discussed above, the first step in our inquiry notice analysis requires us to determine what facts Pioneer knew at the time it purchased the Property. Pioneer purchased Parcels 36, 37, and 38 on November 13, 2000,[34] and it purchased Parcel 25 on August 13, 2001.[35] But Mr. Call did not visit the Property until April of 2001. Because the site visit occurred *after* Pioneer purchased Parcels 36, 37, and 38, anything Pioneer observed during that visit is irrelevant to whether it had notice of the unrecorded leas-

---

32. *Id.*

33. *Ault,* 2002 UT 33, ¶ 31, 44 P.3d 781; *see* UTAH CODE § 57–3–103.

34. It is undisputed that Pioneer recorded its interest in Parcels 36, 37, and 38 before any Defendant recorded a competing interest in those parcels.

35. *See infra* ¶ 64.

es on those parcels on the date Pioneer purchased them. Thus, the district court erred in concluding that any information Pioneer learned during the site visit was relevant to determining the priority of its interest in Parcels 36, 37, and 38. Instead, any knowledge that Pioneer obtained during the visit is relevant only to determining the priority of its interest in Parcel 25.

¶ 34 The second step in our inquiry notice analysis requires us to determine whether the facts Pioneer actually knew at the time it purchased Parcel 25 would lead a reasonable person to inquire further into whether any unrecorded interests encumbered that parcel. Although Mr. Call observed improvements to the Property that suggested the existence of leases, his observations were consistent with Pioneer's knowledge that the Property was encumbered by some recorded leases. In other words, he "expected to find, and did find," evidence of leases.[36] Accordingly, because there was nothing about Mr. Call's observations that would have led a reasonable person to inquire into whether there were unrecorded leases on the Property, Pioneer had no duty to compare the location of the improvements Mr. Call observed with the location of the recorded leases. Thus, we conclude that Mr. Call's observations did not impart to Pioneer notice of the Parcel 25 Defendants' unrecorded leases. Accordingly, we reverse the district court's grant of summary judgment to the Defendants on this basis.

B. *Because the Contents of the Sunrise Village Documents and the Recorded Leases Did not Suggest that the Property Was Encumbered by Unrecorded Leases, They Did not Impart Record Notice of the Unrecorded Leases*

¶ 35 The district court found that KDA had recorded, with the county recorder,

"documents for its Sunrise Village RV Park, including ... a declaration of membership plat giving [a] legal description of the property, and a hand-drawn plat detailing the different RV sites available for lease, including the phases of the planned development." The court also found that several leasehold interests, which were "virtually identical" to those of the Defendants, were recorded before Pioneer purchased the Property. The court concluded that "[b]y use of the words 'Members Association' and 'recognize other Lessees['] rights' in all of the leases, [the recorded] leases indicate that Sunrise Village is an integrated development with multiple lot owners or leaseholders." Relying on these findings, the court concluded that Pioneer had record notice of the Defendants' unrecorded leases. We disagree.

¶ 36 There is no dispute that the Sunrise Village Documents were recorded. Nor is there any dispute that some leases that encumbered the Property were recorded. And because these documents were properly filed with the county recorder, knowledge of their contents is imparted to Pioneer under the Recording Statute.[37] Thus, it was appropriate for the district court to charge Pioneer with knowledge that the Property was developed as an RV park and that some of the sites have been leased.[38]

¶ 37 The information contained in the recorded documents was consistent with Pioneer's understanding that the Property was encumbered by leases. Nothing in the contents of those documents suggested that the Property was encumbered by unrecorded leases. And as discussed above, information that is consistent with a subsequent purchaser's knowledge that a property is encum-

---

36. *See Stumph,* 740 P.2d at 822.

37. Utah Code § 57-3-102(1) ("Each document ... shall, from the time of recording with the appropriate county recorder, impart notice to all persons of their contents."); *Haik,* 2011 UT 26, ¶ 14, 254 P.3d 171 (stating that "purchasers of real property are charged with having record notice of the contents of recorded documents").

38. The district court also found that, because the Warranty Deed expressly states that the convey-

ance was made "[s]ubject to all ... agreements, memberships, leases and right of ways [sic] of record," that Pioneer "obtained its ... interests in the Property subject to" these restrictions. We agree. But because Pioneer does not dispute that its interest is inferior to the interests of those who recorded before Pioneer purchased the Property, this finding does not inform our analysis of this issue.

bered by recorded interests is insufficient to put the purchaser on notice of unrecorded interests. Accordingly, the district court erred when it concluded that these documents imparted to Pioneer record notice of the Defendants' unrecorded leases, and we reverse the court's grant of summary judgment to the Defendants on this basis.

C. *Because Information Contained in the Appraisal Report Would Have Imparted to Pioneer Inquiry Notice of the Unrecorded Leases, We Reverse Summary Judgment on This Issue and Remand for Further Proceedings*

¶ 38 The district court found that United West commissioned an appraisal of the Property to convince Pioneer to finance United West's purchase of the Property. The final Appraisal Report is dated December 29, 2000, and consists of three parts: a two-page cover letter, a lengthy report, and several pages of addenda. The cover letter states that the market value of the Property, "as of November 14, 2000, is $6,630,000." The first page of the cover letter warned that "[t]his letter of transmittal is only that and should not be used as a letter appraisal."

¶ 39 The Report itself contains a detailed analysis of the information upon which the appraisal was based, including photos of the Property and comparable land sales. But before providing these details, the Report provides a "summary of important data and conclusions," which indicates that "[t]he middle part [of the Property] consists of 52 lots ... sold on a membership in an owners' association that will take control after the sale of all the middle lots—there are 24 lots remaining unsold (the land is on a 99 year lease)." Finally, the Site Map included within the addenda to the Report is titled "Sunrise Village R.V. Park" and shows "SOLD" stamped across twenty-eight sites.

¶ 40 Pioneer asserts that it only received the first two pages of the Appraisal Report,

and disputes that it ever received the Report in its entirety. But the district court concluded that Pioneer had "access to" the Report, and in response to Pioneer's assertion that it never received it, the court stated that Pioneer's "failure to review the property appraisal on land securing a one and a half million dollar loan seems akin to intentionally donning blinders." Accordingly, the court concluded that Pioneer's access to the Appraisal Report imparted to Pioneer inquiry notice of the unrecorded leases.

¶ 41 We agree that the information contained in the Appraisal Report may have imparted to Pioneer inquiry notice of the Defendants' unrecorded interests. But as explained above, the first step in our inquiry notice analysis requires us to determine what facts Pioneer *actually knew* at the time it purchased the Property.[39] And we cannot make this determination because the relevant facts are unclear from the record before us. Specifically, we cannot determine whether or when Pioneer received the Appraisal Report. Accordingly, we remand the case so that the district court may make factual determinations and resolve this issue.

¶ 42 First, the district court should determine whether and when Pioneer received the Appraisal Report. If, as Pioneer asserts, it only ever received the cover letter, then information in the rest of the Appraisal Report could not have imparted any notice to Pioneer because Pioneer could not have had actual knowledge of its contents. But if the district court concludes that Pioneer received the Appraisal Report, then the district court should determine the date on which Pioneer received it. If Pioneer received the Report before it purchased the Property, then the contents of the Report are facts that Pioneer knew at the time Pioneer purchased the Property, and they are relevant to a determination of whether Pioneer had inquiry notice of the unrecorded leases.[40]

---

39. Pioneer purchased Parcels 36, 37, and 38 on November 13, 2000. And as discussed in part II.C, below, we conclude that Pioneer purchased Parcel 25 on August 13, 2001.

40. If the district court determines that Pioneer received the Report, then Pioneer is charged

with knowledge of the contents of the Report. *See Allied Materials,* 291 P.2d at 885–86 (holding that a subsequent purchaser may not "shut his eyes or his ears to avoid information" or "remain wilfully ignorant" of facts that give rise to a duty to inquire) (internal quotation marks omitted).

¶ 43 Second, the district court should determine whether the information in the Appraisal Report would have led a reasonable person to inquire further. To do so, the court should determine, among other things, how many leases had been recorded by the time Pioneer purchased the Property. We note that the Report clearly indicates that by late 2000,[41] twenty-eight leases encumbered the Property. Thus, depending on the number of leases that had been recorded by the time Pioneer purchased the Property, the disparity between the twenty-eight leases referenced in the Report and the number of leases that were actually recorded could have been sufficient to put Pioneer on notice that further investigation was warranted. In other words, if the disparity is significant, then the information contained in the Report would have been inconsistent with what Pioneer should have expected to find, based on its knowledge of the number of recorded leases. Accordingly, Pioneer would have been put on notice that further investigation into whether the Property was encumbered by unrecorded leases was warranted. Similarly, a small disparity between the number of recorded leases and the twenty-eight leases referenced in the Appraisal Report would have been less likely to alert Pioneer that further investigation was warranted.

¶ 44 As discussed above, because they were consistent with Pioneer's understanding that the Property was encumbered by leases, neither Pioneer's observations of improvements on the Property nor the contents of recorded documents imparted to Pioneer notice that the Property was encumbered by the Defendants' unrecorded leases. Accordingly, we reverse the district court's grant of summary judgment on this issue. But because the information contained in the Appraisal Report could have alerted Pioneer to the existence of the Defendants' unrecorded leases, we remand for the district court to resolve this issue.

¶ 45 Additionally, we note that as the district court makes factual findings under the standard that we clarify in this opinion, it may identify additional facts that are relevant to determining the priority of interests in the Property.[42] Accordingly, on remand, the court should determine whether Pioneer knew any other facts that gave rise to constructive notice of the Defendants' unrecorded leases.

II. BECAUSE NEITHER THE ORIGINAL DEEDS NOR THE MODIFICATION DEEDS CONVEYED PARCEL 25 TO PIONEER, AND THE NALDER AFFIDAVIT DID NOT CURE THIS DEFECT, ANY PARCEL 25 DEFENDANT WHO RECORDED ITS INTEREST BEFORE PIONEER ACQUIRED PARCEL 25 HAS AN INTEREST SUPERIOR TO PIONEER'S

¶ 46 The legal descriptions of the property that KDA conveyed to United West in the Warranty Deed included Parcel 36, Parcel 37, and Parcel 38, but "omitted reference to" Parcel 25. Thus, when Pioneer recorded its Trust Deed on November 17, 2000, it did not have title to Parcel 25. Pioneer attempted to correct this omission by including Parcel 25 in its Modification Deeds, both of which it recorded on August 14, 2001. And on September 24, 2002, Laren Nalder, an employee of the title company that was a party to both the Original Deeds and the Modification Deeds, attempted to retroactively add Parcel 25 to the Original Deeds. But KDA did not actually convey Parcel 25 to Pine Ridge, United West's successor, until March 9, 2005.

¶ 47 The Parcel 25 Defendants each purchased their interests in Parcel 25 sometime after Pioneer recorded its Original Deeds on November 17, 2000. The district court concluded that the Modification Deeds, which were recorded on August 14, 2001, did not impart to the Parcel 25 Defendants record notice that Pioneer purported to have an interest in Parcel 25. The district court

---

**41.** Although the Report provides an appraisal of the property "as of November 14, 2000," it also states that "[p]reparation for the report commenced on October 12, 1999 ... and was concluded December 29, 2000."

**42.** For example, the June 5, 2001 "Purchase and Sale Agreement" between KDA and Pine Ridge

indicates that only twenty-four lots on Parcel 25 remained to be leased. If the district court determines that this number is significantly different than the information Pioneer would have found in recorded documents, then the disparity could have been sufficient to put Pioneer on notice that further investigation was warranted.

further concluded that the Parcel 25 Defendants' interests in the Property were superior to Pioneer's because Pioneer had not recorded its interest in Parcel 25 before the Parcel 25 Defendants obtained their interests in the Property.

¶ 48 On appeal, Pioneer argues that its Modification Deeds provided constructive notice to the Parcel 25 Defendants of Pioneer's interest in Parcel 25, regardless of the fact that it did not actually have title to Parcel 25 when it recorded them. Alternatively, Pioneer argues that even if its title to Parcel 25 was initially a wild deed, Pioneer cured that defect with the Nalder Affidavit. Finally, Pioneer argues that any defect in its title was retroactively cured under the doctrine of after-acquired title because KDA eventually conveyed Parcel 25 to Pine Ridge through the Quitclaim Deed. Pioneer asserts that the Quitclaim Deed retroactively validated the Modification Deeds.

¶ 49 For the reasons discussed below, we conclude that Pioneer's Modification Deeds did not impart to the Parcel 25 Defendants constructive notice that Pioneer had an interest in Parcel 25. We also conclude that the Nalder Affidavit did not retroactively add Parcel 25 to the conveyance in the Original Deeds. And even though we agree with Pioneer that the doctrine of after-acquired title cured the defect in the Modification Deeds, we conclude that Pioneer's interest in Parcel 25 remains inferior to that of any Parcel 25 Defendant who recorded its interest in the Property before Pioneer obtained actual title to Parcel 25.

A. *Because the Modification Deeds Were Wild Deeds, Recording Them Imparted to the Parcel 25 Defendants Record Notice Only that Pioneer's Purported Interest in Parcel 25 Was Defective*

 ¶ 50 The district court found that the Modification Deeds did not impart to the Parcel 25 Defendants record notice of Pioneer's purported interest in Parcel 25. We agree. Because Pine Ridge did not have title to Parcel 25 when it purported to convey Parcel 25 to Pioneer through the Modification Deeds, the Modification Deeds were wild deeds. And recording the wild deeds gave rise to record notice only that Pioneer's interest in Parcel 25 was defective.

 ¶ 51 A wild deed is a deed executed by a grantor who does not have record ownership of the property.[43] And "a purchaser whose chain of title is founded on a wild deed cannot be a bona fide purchaser under Utah's Recording Statute," and therefore cannot take priority over a purchaser whose title has no defect.[44] Through the Modification Deeds, Pine Ridge purported to convey to Pioneer an interest in Parcel 25. But at that time, Pine Ridge had no such interest to convey because KDA had not yet conveyed Parcel 25 to Pine Ridge. Accordingly, at the time they were created, the Modification Deeds were wild deeds, and any interest Pioneer claimed to have in Parcel 25 under the Modification Deeds was defective.

¶ 52 Pioneer argues that, even if the Modification Deeds did not convey valid title to Parcel 25, they imparted to the Parcel 25 Defendants record notice that Pioneer claimed an interest in Parcel 25 and thus prevented the Parcel 25 Defendants from becoming bona fide purchasers.[45] We disagree.

 ¶ 53 Under the Recording Statute, recording the Modification Deeds imparted to the Parcel 25 Defendants notice of their contents.[46] But we have held that "one who deals with real property is charged with notice of what is shown by the records of the

---

43. *Salt Lake Cnty. v. Metro W. Ready Mix, Inc.*, 2004 UT 23, ¶ 16, 89 P.3d 155.

44. *Id.* ¶ 17.

45. *See* Utah Code § 57-3-103(1) (providing that a subsequent purchaser must have "purchased the property in good faith" to prevail over a competing interest); *Haik v. Sandy City*, 2011 UT 26, ¶ 14, 254 P.3d 171 (holding that, to take property

in "good faith, a subsequent purchaser must take title to the property without notice of a prior, unrecorded interest in the property") (alteration omitted) (internal quotation marks omitted).

46. *See* Utah Code § 57-3-102(1) ("Each document executed, acknowledged, and certified, in the manner prescribed by this title, ... shall, from the time of recording with the appropriate

county recorder ..., and by implication charged with notice of what the records should show but do not, i.e., a lack of record title in a grantor."[47] Similarly, we have held that "by definition a purchaser whose title is founded on a wild deed is on notice that his grantor had no record title to the property purportedly being conveyed."[48] Thus, a person who records a defective deed imparts to subsequent purchasers notice only that his claimed interest is defective.

¶ 54 In this case, if the purported conveyance in the Modification Deeds had been legitimate, recording the Modification Deeds would have imparted to the Parcel 25 Defendants record notice of Pioneer's interest. This would have prevented the Parcel 25 Defendants from becoming bona fide purchasers. But because the conveyance was not legitimate, a title search would have revealed that Pine Ridge did not have the title it purported to convey in the Modification Deeds.[49] Accordingly, the contents of the Modification Deeds imparted to the Parcel 25 Defendants notice only that Pioneer had a wild deed to Parcel 25.[50] We conclude that this notice did not prevent the Parcel 25 Defendants from purchasing their interests in good faith and becoming bona fide purchasers. Consequently, we affirm the district court's conclusion that Pioneer's recording of the Modification Deeds did not give it an interest in Parcel 25 that is superior to the Parcel 25 Defendants' interests.

*B. Because Omitting a Parcel from a Conveyance Is not a Minor Typographical or Clerical Error, the Nalder Affidavit Did not Cure the Defect in Pioneer's Title to Parcel 25*

¶ 55 Pioneer argues that KDA intended to include Parcel 25 in its original conveyance to Pine Ridge, and that the omission of Parcel 25 from the Original Deeds was a simple oversight.[51] Further, Pioneer contends that the Nalder Affidavit effectively corrected that "clerical error" as permitted by section 57–3–106(9) of the Utah Code.[52] But the district court found that the omission of Parcel 25 from the Original Deeds was not an error that could be corrected by the recording of an affidavit. We agree.

¶ 56 Section 57–3–106(9) of the Utah Code provides that "[m]inor typographical or clerical errors in a document of record may be corrected by the recording of an affidavit or other appropriate instrument." Neither the statute nor our prior opinions explain what constitutes a minor typographical or clerical error. "When interpreting statutory language, we generally seek to read each term according to its ordinary and accepted meaning."[53] But because "minor typographical or clerical error[ ]" does not have a single "ordinary and accepted meaning," we interpret the phrase "based upon the context in

---

county recorder, impart notice to all persons of their contents.").

47. *Metro W. Ready Mix, Inc.*, 2004 UT 23, ¶ 17, 89 P.3d 155 (alteration omitted) (internal quotation marks omitted).

48. *Id.* This is true regardless of whether the purchaser searched the records and discovered the defect in the title. *Id.*

49. *See id.* ¶ 16 (suggesting that "a purchaser who takes title through a wild deed is not the type of purchaser that recording statutes protect").

50. *See id.* ¶ 17.

51. In its reply brief, Pioneer devotes two sentences to an argument that the Original Deeds "mistakenly did not conform to the intent of both parties and should therefore be reformed." But Pioneer made no such argument in its opening brief, and "[i]t is well settled that issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court." *Allen v. Friel*, 2008 UT 56, ¶ 8, 194 P.3d 903 (internal quotation marks omitted). Further, "[a]n appellate court is not a depository in which a party may dump the burden of argument and research," and an appellant "must plead [its] claims with sufficient specificity for this court to make a ruling on the merits." *Id.* ¶ 9 (alteration omitted) (internal quotation marks omitted). For these reasons, we decline to consider Pioneer's mutual mistake argument.

52. *See* UTAH CODE § 57–3–106(9) ("Minor typographical or clerical errors in a document of record may be corrected by the recording of an affidavit or other appropriate instrument.").

53. *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 18, 267 P.3d 863 (internal quotation marks omitted).

which it is used." [54]

¶ 57 Our analysis of a typographical error in a similar context suggests that an error is a "minor typographical or clerical error" only if it is obvious that the document contains an error, and the error did not actually cause confusion. In *Concepts, Inc. v. First Security Realty Services, Inc.*, we held that an error in a notice for a trustee's sale—which was posted in 1983 but improperly stated the sale was occurring in October of 1982—was a minor typographical error and did not undermine the validity of the sale because it could "hardly be argued ... that the notice confused bidders." [55] And we have explained that a mistake in a judgment or order is a "clerical error" if it "is one made in recording a judgment that results in the entry of a judgment which does not conform to the actual intention of the court." [56]

▮ ¶ 58 Indeed, nothing in the language of the statute or in our prior opinions suggests that the omission of an entire parcel of property in a deed is a "minor typographical or clerical error." And courts in other jurisdictions have concluded that significant changes to deeds—such as the improper characterization of a grantee, the omission of a grantee, and the conveyance of an incorrect parcel of land—were not minor typographical or clerical errors that could be remedied with a corrective deed or the filing of an affidavit. [57] Accordingly, we conclude that the omission of a parcel of property from a conveyance is not a minor typographical or clerical error that can be corrected by recording an affidavit or other instrument pursuant to section 57–3–106(9) of the Utah Code.

¶ 59 In this case, the Original Deeds conveyed only Parcels 36, 37, and 38 from KDA

to United West. Two years later, the Nalder Affidavit was recorded in an attempt to add Parcel 25 to that conveyance. Because we conclude that the omission of a parcel of property from a conveyance cannot be corrected by filing an affidavit, we agree with the district court's conclusion that the Nalder Affidavit did not correct the omission of Parcel 25 from the Original Deeds.

*C. Although the Quit Claim Deed Retroactively Validated Pioneer's Title to Parcel 25, Pioneer's Title to Parcel 25 Remains Inferior to the Interests of Any Parcel 25 Defendant Who Recorded Its Interest Between the Date Pioneer Executed Its Modification Deeds and the Date Pioneer Executed its Quit Claim Deed*

▮ ¶ 60 The district court concluded that the Modification Deeds did not convey Parcel 25 to Pioneer, and accordingly, that Pioneer's interest in Parcel 25 is inferior to the interests of the Parcel 25 Defendants. But Pioneer argues that any defect in its title to Parcel 25 under the Modification Deeds was cured when KDA later actually conveyed Parcel 25 to Pine Ridge. Pioneer argues that, under the doctrine of after-acquired title, the Quitclaim Deed that conveyed Parcel 25 from KDA to Pine Ridge on March 9, 2005, retroactively validated the Modification Deeds, which purported to convey Parcel 25 from Pine Ridge to Pioneer on August 13, 2001. Pioneer concludes that this retroactive validation gives it an interest in Parcel 25 that is superior to the interests of the Parcel 25 Defendants.

¶ 61 We agree that the Quitclaim Deed retroactively validated Pioneer's defective in-

**54.** *See id.*

**55.** 743 P.2d 1158, 1160–61 (Utah 1987).

**56.** *State v. Rodrigues*, 2009 UT 62, ¶ 14, 218 P.3d 610 (internal quotation marks omitted); *see also* Utah R. Civ. P. 60(a) (permitting the court to correct "clerical mistakes" in judgments or orders).

**57.** *Spain v. EMC Mortg. Co.*, No. CIV 07–0308–PHX–RCB, 2009 WL 2590100, at *5 (D.Ariz. Aug. 20, 2009) (holding that a conveyance to the plaintiff in his capacity as a trust "beneficiary," instead of as "individually" was "not a mere

typographical error," and explaining that "[a] typographical error would be, for example, the difference between the word 'data' and the word 'date' "); *Stone v. Gateway Bank & Trust Co.* (*In re Stone*), No. ADV 11–00006–8–JRL, 2011 WL 5909158, at *2 (Bankr.E.D.N.C. Aug. 15, 2011) (holding that "the addition of a grantee, that was not named in the original deed, is not the type of error that can be corrected through submission of an affidavit"); *Gonzales v. Gonzales*, 116 N.M. 838, 867 P.2d 1220, 1227–28 (N.M.Ct.App.1993) (concluding that a deed could not be "correct[ed]" to convey a different parcel of land).

terest in Parcel 25. But because we conclude that a retroactively validated interest remains inferior to the competing interests of any third parties who recorded their interests before the retroactive validation occurred, we remand this issue so that the district court may determine which Parcel 25 Defendants recorded their interests before Pioneer's interest in Parcel 25 became retroactively validated.

¶ 62 Under section 57–1–10(1) of the Utah Code (After–Acquired Title Statute), a wild deed may be retroactively validated if the grantor subsequently acquires an interest in the property that was previously conveyed. The After–Acquired Title Statute reads as follows:

(1) If any person conveys any real estate by conveyance purporting to convey the real estate in fee simple absolute, and at the time of the conveyance the person does not have the legal estate in the real estate, but afterwards acquires the legal estate:

(a) the legal estate subsequently acquired immediately passes to the grantee, the grantee's heirs, successors, or assigns; and

(b) the conveyance is as valid as if the legal estate had been in the grantor at the time of the conveyance.[58]

¶ 63 In other words, under the statute, "a conveyance made by a grantor not holding fee title to property is binding when the grantor later obtains fee title."[59] Thus, the statute permits a wild deed to become retroactively valid. The purpose of the statute "is to prevent a grantor without title from later challenging his own conveyance of the prop-

erty."[60] As we have explained, "[t]o allow a grantor to deny the terms of its conveyance after acquiring title by repudiating an easement originally intended to be granted would be an invitation to fraud."[61] But the statute retroactively validates only "the legal estate subsequently acquired."[62] Indeed, "the after-acquired title statute conveys title in the condition as it exists at the time title is acquired by the previously titleless grantor."[63]

¶ 64 In this case, Pine Ridge purported to convey Parcel 25 to Pioneer via the Modification Deeds, which were executed on August 13, 2001. As discussed above, the Modification Deeds were wild deeds because, at the time of their execution, Pine Ridge had no title to Parcel 25.[64] But Pine Ridge later obtained title to Parcel 25 via the Quitclaim Deed on March 9, 2005. Thus, under the After–Acquired Title Statute, Pioneer's wild Modification Deeds were retroactively validated by the Quitclaim Deed.[65] Accordingly, we operate under a legal fiction that Pioneer purchased Parcel 25 on August 13, 2001—the date the Modification Deeds were executed— even though the valid Quitclaim Deed conveyance did not occur until 2005.[66]

¶ 65 But the after-acquired title doctrine presents a fundamental problem with respect to race-notice principles because it can lead to inconsistent results. As discussed below, the problem arises when we consider the competing interests in the Property from the respective perspectives of the Parcel 25 Defendants and Pioneer. On the one hand, at the time the Parcel 25 Defendants purchased their interests, they had no notice of Pio-

---

58. Utah Code § 57–1–10(1).

59. *Arnold Indus., Inc. v. Love*, 2002 UT 133, ¶ 16, 63 P.3d 721. In part, the statute has codified the equitable doctrine of estoppel by deed, which is also sometimes referred to as the doctrine of after-acquired title. *Id.; see also Ketchum Coal Co. v. Pleasant Valley Coal Co.*, 50 Utah 395, 168 P. 86, 92 (1917) (applying the doctrine of estoppel by deed and concluding that a party who deeded land that he did not own conveyed good title because he subsequently acquired the land).

60. *FDIC v.Taylor*, 2011 UT App 416, ¶ 22, 267 P.3d 949.

61. *Arnold*, 2002 UT 133, ¶ 18, 63 P.3d 721.

62. Utah Code § 57–1–10(1)(a).

63. *Taylor*, 2011 UT App 416, ¶ 21, 267 P.3d 949; *see also Utah Farm Prod. Credit Ass'n v. Wasatch Bank of Pleasant Grove*, 734 P.2d 904, 906 (Utah 1986) (holding that the conveyance of property after a lien had been attached to it did not affect the lien because the lien encumbered the property at the time it was later conveyed).

64. *See supra* ¶¶ 50–51.

65. *See* Utah Code § 57–1–10(1).

66. *See id.* § 57–1–10(1)(b).

neer's purported competing interest in the parcel, and Pioneer had not yet recorded its interest.[67] Thus, from their perspectives, they should prevail under traditional race-notice principles. But on the other hand, when we apply the after-acquired title doctrine, we give Pioneer the benefit of the August 13, 2001 purchase date. And on that date, Pioneer had no notice of the Parcel 25 Defendants' interests in Parcel 25, and no Parcel 25 Defendant had yet recorded its interest. Thus, from Pioneer's perspective, it should prevail under traditional race-notice principles.

¶ 66 Ultimately, each party has a plausible claim that its interest in Parcel 25 is superior to that of the other party. These inconsistent results are intolerable. Accordingly, to avoid these inconsistencies, we conclude that while the After–Acquired Title Statute retroactively validates a conveyance "as if the legal estate had been in the grantor at the time of the conveyance," [68] it does not serve to impart to competing purchasers notice as of that date.

¶ 67 Below, we illustrate the problem by applying race-notice principles to the competing interests in Parcel 25. We then resolve this problem by articulating a new standard.

1. From Their Perspectives, Under Our Race–Notice Analysis, the Interests of Some of the Parcel 25 Defendants Are Superior to Pioneer's Interest

¶ 68 Some of the Parcel 25 Defendants have a plausible claim that, from their perspectives, their interests in Parcel 25 are superior to Pioneer's. As discussed above, our race-notice principles are set forth in the Recording Statute, which provides that if two purchasers claim title to real property, the subsequent purchaser has a superior interest so long as it took the property in good faith and was the first to record its interest.[69] Accordingly, we consider (a) whether the Parcel 25 Defendants purchased their interests in good faith, and (b) whether they were the first to record their interests.

a. The Parcel 25 Defendants Purchased Their Interests in Good Faith

¶ 69 To assess whether the Parcel 25 Defendants took their interests in good faith, we must determine whether they had notice of a competing interest.[70] The Parcel 25 Defendants purchased interests in Parcel 25 sometime between November 17, 2000 and September 24, 2002.[71] As discussed above, the first step in our inquiry notice analysis requires us to consider what the Parcel 25 Defendants knew at that time.

¶ 70 The first document Pioneer recorded that would have imparted record notice of Pioneer's interest in Parcel 25 was the Quitclaim Deed, which was recorded on March 14, 2005.[72] And the Quitclaim Deed was not recorded until after the Parcel 25 Defendants purchased their interests. Accordingly, no recorded document would have suggested to the Parcel 25 Defendants that Pioneer claimed an interest in the Property. Thus, in

---

67. *See supra* Part II.A (concluding that because the Modification Deeds were wild deeds, they imparted record notice to the Parcel 25 Defendants only that Pioneer's purported interest in Parcel 25 was defective). Further, we note that as discussed *infra* in Part II.C.1.b, only the Parcel 25 Defendants who recorded their interests before March 14, 2005, could plausibly claim that their interests are superior to Pioneer's.

68. UTAH CODE § 57–1–10(1)(b).

69. UTAH CODE § 57–3–103; *Ault v. Holden*, 2002 UT 33, ¶ 31, 44 P.3d 781.

70. *Haik*, 2011 UT 26, ¶ 14, 254 P.3d 171 ("To be in good faith, a subsequent purchaser must take title to the property without notice of a prior, unrecorded interest in the property." (alteration omitted) (internal quotation marks omitted)).

71. Because the district court used different designations for the groups of Defendants in this case, it is not clear from the record when each of the Parcel 25 Defendants purchased its interest. We note that our analysis in this section applies to any Parcel 25 Defendant who purchased its interest before March 14, 2005, the day the Quitclaim Deed was recorded. Indeed, any Parcel 25 Defendant who purchased its interest after that date would have had record notice of Pioneer's valid interest in Parcel 25 and therefore could not be considered a good faith purchaser.

72. Although Pioneer recorded its Modification Deeds on August 14, 2001, as discussed above in Part II.A, the Modification Deeds did not impart to the Parcel 25 Defendants record notice that Pioneer claimed an interest in Parcel 25.

the second step of our inquiry notice analysis, we conclude that, when they purchased their interests, the Parcel 25 Defendants did not know any facts that would have led a reasonable person to inquire into whether there were competing interests in Parcel 25. The Parcel 25 Defendants therefore purchased their interests in good faith and without notice of Pioneer's competing interest.

### b. Some of the Parcel 25 Defendants May Have Been the First to Record Their Interests in Parcel 25

¶ 71 Having determined that the Parcel 25 Defendants were good faith purchasers, our race-notice analysis requires us to consider next whether any Parcel 25 Defendant's interest was "first duly recorded." [73] In other words, we consider whether any Parcel 25 Defendant recorded its interest before Pioneer recorded its Quitclaim Deed on March 14, 2005. Although whether and when each of the Parcel 25 Defendants recorded its interest is unclear from the record before us, we note that some of them may have recorded their interests prior to March 14, 2005. And under our race-notice principles, because the Parcel 25 Defendants were good faith purchasers, the interest of any Parcel 25 Defendant who recorded its interest in the Property before March 14, 2005, would be superior to Pioneer's. Consequently, depending upon the date they recorded their interests, some of the Parcel 25 Defendants would have a plausible claim that their interest in Parcel 25 is superior to Pioneer's.

### 2. From Its Perspective, When We Apply the After–Acquired Title Doctrine to Our Race–Notice Analysis, Pioneer's Interest in Parcel 25 Is Superior to the Interests of the Parcel 25 Defendants

¶ 72 Applying the same race-notice principles to Pioneer's interest, Pioneer has a plausible claim that, from its perspective, its interest in the Property is superior to the interests of the Parcel 25 Defendants. Again, we consider (a) whether Pioneer pur-

chased its interest in good faith, and (b) whether it was the first to record its interest.

### a. Pioneer Purchased Its Interest in Parcel 25 in Good Faith

¶ 73 To assess whether Pioneer took Parcel 25 in good faith and without notice of a competing interest, we consider whether Pioneer knew of a competing interest at the time it purchased Parcel 25.[74] Again, because the Modification Deeds were retroactively validated by the Quitclaim Deed, we give Pioneer the benefit of the legal fiction that Pioneer purchased Parcel 25 on August 13, 2001. As discussed above in Part I, on August 13, 2001, Pioneer did not have constructive notice of any of the Parcel 25 Defendants' interests in the Property, and thus did not know any facts that would have led a reasonable person to inquire into whether there were competing interests. Further, Pioneer did not have record notice of any competing interests in Parcel 25 because, on that date, no Parcel 25 Defendant had recorded its interest. Accordingly, if we consider August 13, 2001 to be the date Pioneer purchased Parcel 25, we would conclude that Pioneer did so in good faith and without notice of the Parcel 25 Defendants' competing interests.

### b. Pioneer Was the First to Record Its Interest in Parcel 25

¶ 74 Next, we consider whether Pioneer was the first to record its interest in Parcel 25. Pioneer recorded its Modification Deeds on August 14, 2001. And under the After–Acquired Title Statute, once the Modification Deeds were retroactively validated, "the conveyance [wa]s as valid as if the legal estate had been in the grantor at the time of the conveyance." [75] Thus, if we consider August 14, 2001 to be the date Pioneer recorded its interest, we would conclude that Pioneer was the first to record its interest in Parcel 25. Accordingly, Pioneer would have a plausible

---

**73.** *See* UTAH CODE § 57–3–103(2).

**74.** *Haik,* 2011 UT 26, ¶ 14, 254 P.3d 171 ("To be in good faith, a subsequent purchaser must take title to the property without notice of a prior,

unrecorded interest in the property." (alteration omitted) (internal quotation marks omitted)).

**75.** UTAH CODE § 57–1–10(1)(b).

claim that its interest in Parcel 25 is superior to the interests of the Parcel 25 Defendants.

3. A Retroactively Validated Interest Remains Inferior to the Interest of a Third Party Who Recorded Its Interest Before the Retroactive Validation Occurred

¶ 75 As illustrated above, interjecting the legal fiction created by the After–Acquired Title Statute into our race-notice analysis creates a fundamental problem with respect to race-notice principles because it produces inconsistent results. These inconsistent results undermine the purpose of Utah's race-notice principles and are unfair to everyone who relies upon those principles to assess the priority of their interests in property. Accordingly, we conclude that while the After–Acquired Title Statute may retroactively validate a conveyance that would otherwise be invalid,[76] the retroactively validated purchase date does not serve to impute record notice to subsequent purchasers. Thus, a retroactively validated interest remains inferior to the interest of a third party who recorded its interest before the retroactive validation occurred.

¶ 76 The Utah Court of Appeals recently considered a similar situation in *F.D.I.C. v. Taylor*.[77] At issue in *Taylor* was whether the After–Acquired Title Statute permits "a conveyance triggered by the after-acquired title statute to prevail over the interest of a subsequent purchaser who obtained title from the record owner of the property and recorded ... that interest during the interim between the conveyance by the titleless grantor and that grantor's subsequent acquisition of title."[78] The court concluded that, even though the After–Acquired Title Statute retroactively validated the prior invalid conveyance, it did not defeat the rights of the third party who purchased and recorded its

interest in the time between the invalid and valid conveyances.[79]

¶ 77 The court explained that to hold otherwise would permit the After–Acquired Title Statute to displace the Recording Statute, which would "undermine the purposes of Utah's race-notice principles."[80] The court noted that "[t]he recording statute is intended to impede fraud, to foster the alienability of real property, and to provide for predictability and integrity in real estate transactions."[81] Thus, the court reasoned that if it "adopted the view that the recorded interest of a party obtained for value from the record owner is void as against an interest in the property previously conveyed by someone who had no right to convey it, that intent would not be advanced."[82] Instead, the court concluded that "such an approach would be directly contrary to the recording statute's purpose to protect the purchaser's interest against the asserted interest of any third parties, and to inform third parties of the existence of pre-existing encumbrances on the property."[83]

¶ 78 We agree with the court of appeals' reasoning on this issue. As we see in this case, the effect of the After–Acquired Title Statute can undermine the purpose of Utah's race-notice principles by producing inconsistent results under a race-notice analysis. To avoid these inconsistent results, we conclude that a party who receives after-acquired title takes that title subject to the rights of any third party who recorded its interest in the time between the defective conveyance and the conveyance that retroactively validated it. In other words, a retroactively validated interest cannot defeat the interest of a third party who recorded its interest before the retroactive validation occurred.

¶ 79 Applying this rule to Parcel 25, we conclude that Pioneer's interest is inferior to

76. *See id.* (providing that a retroactively validated conveyance "is as valid as if the legal estate had been in the grantor at the time of the conveyance").

77. 2011 UT App 416, 267 P.3d 949.

78. *Id.* ¶ 16.

79. *Id.* ¶ 18.

80. *Id.* ¶ 23.

81. *Id.* (internal quotation marks omitted).

82. *Id.*

83. *Id.* (internal quotation marks omitted).

the interest of any Parcel 25 Defendant who recorded its interest before March 9, 2005, the date the Modification Deeds became retroactively validated. Accordingly, we remand this issue for further proceedings consistent with the standard we have clarified in this opinion. We note that if the district court finds that any Parcel 25 Defendant recorded its interest before March 9, 2005, the interest of any such Parcel 25 Defendant will be superior to that of Pioneer.

### D. The Fact that the Payment Defendants Have not Yet Paid Their Purchase Contracts in Full Does not Affect Their Interests in the Property

¶ 80 The Payment Defendants' purchase contracts provide that they will "receive a certificate of ownership when [the] contract is paid in full." The district court found that this contractual language did not affect the priority of the interests in the Property. But Pioneer argues that, because the Payment Defendants have not yet paid in full, they are "not yet even entitled to receive any ownership or other interest in" the Property.[84]

¶ 81 We agree with the district court that whether or not the Payment Defendants have paid for their interests in full is irrelevant to a determination of the priority of interests in this case. It is well-settled that a party who purchases property under an executory real estate contract obtains a recognizable interest in the property before the contract is paid in full.[85] Accordingly, the Payment Defendants obtained an interest in

the Property on the date they executed their purchase contracts, and this issue does not affect the priority of their interests in the Property.

### III. THE DEFENDANTS' REFERENCES TO PIONEER'S INSURANCE COVERAGE DO NOT WARRANT REVERSAL BECAUSE PIONEER HAS NOT SHOWN ANY RESULTING HARM

¶ 82 In their pleadings before the district court, the Defendants referred to the fact that Pioneer held title insurance on the Property. Specifically, in a memorandum in opposition to Pioneer's motion for summary judgment, the Defendants argued that Pioneer's insurance policy provided a remedy with respect to the omission of Parcel 25 from the Original Deeds, and that "the risks contractually assumed by the title insurance company must not be overlooked or ignored." Similarly, in a footnote to a different memorandum opposing summary judgment,[86] the Defendants argued that the recorded leases that encumbered the Property "were excepted from the title insurance commitments and title policies issued to Pioneer." In support of that statement, the Defendants attached the relevant policies to their memorandum.

¶ 83 Pioneer argues that this reference was "prejudicial and support reversal" because they improperly suggested to the district court that Pioneer had an alternate source of payment for damages. The Defendants respond that they mentioned the policy

---

**84.** In its reply brief, Pioneer argues that under *Haik v. Sandy City*, the interest of a party who has recorded an executory contract should be deemed inferior to the interest of a subsequent purchaser. *See* 2011 UT 26, 254 P.3d 171. But Pioneer made no such argument in its opening brief, and "[i]t is well settled that issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court." *Friel*, 2008 UT 56, ¶ 8, 194 P.3d 903 (internal quotation marks omitted). Accordingly, we decline to consider it.

**85.** *See, e.g., Cannefax v. Clement*, 818 P.2d 546, 548 (Utah 1991) (noting that a vendee in a real estate contract "is treated as having a real property interest"); *Butler v. Wilkinson*, 740 P.2d

1244, 1255 (Utah 1987) (explaining that, under the doctrine of equitable conversion, the vendor to an executory real estate contract retains an "interest in personalty," and the vendee obtains an "interest in realty"); *Bill Nay & Sons Excavating v. Neeley Constr. Co.*, 677 P.2d 1120, 1121 (Utah 1984) (holding that a purchaser under a real estate contract has an equitable interest in real property); *Lockhart Co. v. Anderson*, 646 P.2d 678, 679 (Utah 1982) ("It is clear from earlier decisions of this Court that the buyer's interest under a real estate contract is an interest in real property.").

**86.** Because different groups of the Defendants have been represented separately in this case, the Defendants submitted multiple memoranda opposing Pioneer's motion for summary judgment.

only to show that Pioneer had constructive notice of the recorded leases that were reflected in the policy's title commitment. Further, they argue that if any error was caused by, that error was harmless at most because nothing in the record indicates that the statement influenced the trial court's decision. We agree.

¶ 84 Under the collateral source rule, "a wrongdoer is not entitled to have damages, for which he is liable, reduced by proof that the plaintiff has received or will receive compensation or indemnity for the loss from an independent collateral source." [87] Indeed, we have long held that "the question of insurance is immaterial and should not be injected into the trial[,]and that it is the duty of both counsel and the court to guard against it." [88] And we have noted that "[t]he reasons for this appear to be that because of their lack of professional training and experience in such matters the jurors might be motivated by improper considerations in resolving the issues." [89]

¶ 85 But a party's reference to another party's insurance coverage does not automatically warrant reversal. Even when references to a party's insurance coverage have been made before a jury, we have consistently refused to reverse the jury's decision unless it prejudiced the trial, meaning that "there is a reasonable likelihood that in the absence of the incident there would have been a substantially different result." [90] Further, we have noted that although such references might have the potential to mislead jurors, "this should not be true of the judge and the attorneys" because "[t]hey are presumably conditioned by education, training and experience to render service of a professional character under a discipline which should involve a high degree of integrity." [91] We have explained that attorneys have a duty "to seek the truth and to do justice," and that "[i]t runs contrary to this purpose and casts an unfavorable reflection upon the integrity of the court and the attorneys if they must treat ... the existence of insurance as though it would corrupt the whole procedure if the lawyers and the court knew about it." [92]

¶ 86 In this case, Pioneer speculates that the Defendants' statements "appear to have impacted the outcome of the case" and that they "account for the District Court's erratic and inconsistent self reversals in applying record notice at various times and inquiry notice at other times as it attempted to craft an outcome, taking into account potential insurance coverage against some of its rulings." But even if there are some differences in the court's application of constructive notice principles in the orders it issued over the several years this case was litigated, there is no indication that those differences were caused by the court's taking into account Pioneer's potential insurance coverage.[93] We conclude that Pioneer has failed to show that the statements prejudiced the outcome of the proceedings because Pioneer has failed to show that, but for the statements, there is a reasonable likelihood that the outcome would have been different. Once again, we decline to "treat ... the existence of insurance as though it would corrupt the whole procedure if ... the court knew about it." [94] Accordingly, we decline to reverse the district court's decision on this basis.

87. *Gibbs M. Smith, Inc. v. U.S. Fid. & Guar. Co.*, 949 P.2d 337, 345 (Utah 1997) (internal quotation marks omitted).

88. *Robinson v. Hreinson*, 17 Utah 2d 261, 409 P.2d 121, 123 (1965).

89. *Ellis v. Gilbert*, 19 Utah 2d 189, 429 P.2d 39, 41 (1967).

90. *Robinson*, 409 P.2d at 123; *see also Weeks v. Calderwood*, 191 P.3d 1, 3 (Utah 1979) ("The mere mention of the term 'insurance' seems to trigger reaction in parties who are dissatisfied with a jury verdict. We have heretofore indicated that we do not regard its mere mention as all that explosive or necessarily prejudicial.").

91. *Ellis*, 429 P.2d at 41.

92. *Id.*

93. Although we recite Pioneer's argument that the district court's rulings were inconsistent, we note that both record notice and inquiry notice are types of constructive notice. *Haik v. Sandy City*, 2011 UT 26, ¶ 14, 254 P.3d 171.

94. *Ellis*, 429 P.2d at 41.

## CONCLUSION

¶ 87 Because the court applied an improper standard for constructive notice, we reverse the district court's grant of summary judgment in favor of the Defendants. Although Pioneer had constructive notice that the Property was encumbered by leases, there is no evidence that Pioneer had constructive notice that the Property was encumbered by *unrecorded* leases. Next, we conclude that although Pioneer's defective interest in Parcel 25 was retroactively validated, its interest remains inferior to the competing interest of any Parcel 25 Defendant who recorded its interest before the retroactive validation occurred. Finally, because Pioneer has failed to show that the Defendants' references to Pioneer's potential insurance coverage resulted in prejudice, we decline to reverse the district court's orders on that basis.

¶ 88 We remand this case to the district court so that it may make the factual determinations discussed in this opinion. Additionally, we direct the district court to determine whether any party is entitled to recover the fees it incurred on this appeal. Although Pioneer has argued that it is entitled to recover its fees under "[t]he promissory notes for which Pioneer's Trust Deeds serve as a security," Pioneer has neither provided the promissory notes to us nor directed us to where they may be found in the record. Accordingly, on remand, the district court should determine whether Pioneer is entitled to recover its fees and whether any other party is entitled to recover its fees under the reciprocal attorney fees statute.[95]

Chief Justice DURRANT authored the opinion of the Court, in which Associate Chief Justice NEHRING, Justice DURHAM, Justice PARRISH, and Justice LEE joined.

95. *See* UTAH CODE § 78B–5–826.